**FILED**

March 27, 2024

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ J.A. Ward

DEPUTY

### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### DEL RIO DIVISION

| | | |
|---|---|---|
| SANDRA C. TORRES, INDIVIDUALLY AND AS MOTHER AND REPRESENTATIVE OF THE ESTATE OF DECEDENT, E.T., et al., | § § § § § | |
| | § | Case No. 2:22-CV-00059-AM |
| *Plaintiffs,* | § § | |
| v. | § § | |
| DANIEL DEFENSE, LLC, et al, | § § | |
| *Defendants.* | § § § § | |

---

**PLAINTIFFS' OPPOSITION TO DEFENDANT DANIEL DEFENSE'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

---

To the Honorable Judge Moses:

Sandra C. Torres, individually and as mother and representative of the estate of decedent, E.T., and as next friend of E.S.T., Minor Child; Eli Torres, Jr.; and Justice Torres (collectively "Plaintiffs") file this brief in opposition to the motion to dismiss the First Amended Complaint filed by Defendants Daniel Defense, LLC and Daniel Defense, Inc. (together "Daniel Defense"). The Court should deny that motion for the reasons set forth below.

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

BACKGROUND .........................................................................................................4

STANDARD OF REVIEW .........................................................................................7

ARGUMENT ..............................................................................................................7

   I.  Overview of the Protection of Lawful Commerce in Arms Act.............................7

   II.  Plaintiffs' Allegations That Daniel Defense Violated the FTC Act Satisfy the Predicate Exception. ............................................................................................................9

      A.  The FTC Act is "applicable to the . . . marketing of" firearms and thus is a predicate statute. ...............................................................................................10

      B.  Daniel Defense's arguments for limiting the scope of the predicate exception fail....13

      C.  A predicate statute need not be privately enforceable. ................................16

   III.  Plaintiffs Have Alleged Violations of the FTC Act's Unfairness Standard. ....................19

      A.  Overview of the FTC Act's unfairness standard ........................................19

      B.  The FTC Act uses "consumer" to encompass purchasers *and* others harmed by the seller's conduct. ..........................................................................................20

         i.  The text of the statute supports a broad definition of "consumer."......................20

         ii.  Federal courts have upheld agency enforcement actions for harm to non-purchasers. ........................................................................................................22

         iii.  The FTC's enforcement actions support a broad reading of "consumer." ............23

         iv.  There is no requirement that the injured consumer have purchased Daniel Defense's products or transacted with the company. .............................................24

      C.  Plaintiffs have alleged facts sufficient to show that Daniel Defense engaged in unfair trade practices. ..........................................................................................27

   IV.  Plaintiffs Have Stated a Claim for Negligence Per Se Under Texas Law.........................29

      A.  Plaintiffs are within the class of consumers protected by the FTC Act, and the FTC Act is designed to prevent the time of harm Plaintiffs suffered. ................................29

      B.  Daniel Defense's attempt to add an extra element to negligence per se causes of action should be rejected. ..........................................................................30

      C.  A violation of a civil law may form the basis of a negligence per se cause of action.31

      D.  Using the FTC Act as a basis for a negligence per se action is not contrary to Congressional intent. ..........................................................................................32

      E.  Plaintiffs' negligence per se claim is grounded in Texas common law. .....................35

   V.  The Amended Complaint Alleges Facts Showing Daniel Defense's Conduct Proximately Caused Plaintiffs' Injuries. ..........................................................................................36

   VI.  In the Alternative, Plaintiffs Seek Leave to Amend their Complaint................................42

**CONCLUSION** ................................................................................................................**43**

# TABLE OF AUTHORITIES

## CASES

*Allison v. J.P. Morgan Chase Bank*, N.A.,
No. 1:11-CV-342, 2012 WL 4633177, (E.D. Tex. Oct. 2, 2012)............................................30

*Arista Records, LLC v. Doe 3*,
604 F.3d 110, (2d Cir. 2010) ..............................................................................................40

*Armstrong v. Sw. Airlines Co*.,
No. 3:20-CV-3610-BT, 2021 WL 4391247, (N.D. Tex. Sept. 24, 2021) ..............................34

*Ashe v. Corley*,
992 F.2d 540, (5th Cir. 1993)...............................................................................................41

*Baldwin v. Nat'l W. Life Ins. Co*.,
No. 2:21-CV-04066-WJE, 2021 WL 4206736, (W.D. Mo. Sept. 15, 2021).........................34

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544, (2007) ..............................................................................................................7

*Bostock v. Clayton County, GA.*,
__ U.S. __, 140 S.Ct. 1731, (2020) ......................................................................................21

*Bryant v. CIT Grp./Consumer Fin.*,
No. CV H-16-1840, 2018 WL 1740075, (S.D. Tex. Apr. 11, 2018)................................30, 32

*Burgess v. Bank of Am., N.A.*,
No. 5:14-CV-00495-DAE, 2014 WL 5461803, (W.D. Tex. Oct. 27, 2014).........................30

*Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dep't Stores, Inc.*,
15 F.3d 1275, (5th Cir. 1994) ...............................................................................................21

*Carter v. William Sommerville & Son, Inc.*,
584 S.W.2d 274, (Tex. 1979) .........................................................................................29, 31

*Cervini v. Cisneros*,
593 F. Supp. 3d 530, (W.D. Tex. 2022) .................................................................................7

*Chiapperini v. Gander Mountain Co*.,
13 N.Y.S.3d 777, (N.Y. Sup. Ct. 2014)..................................................................................9

*City of New York v. Beretta U.S.A. Corp*.,
524 F.3d 384 (2d Cir. 2008), *cert. denied*, U.S. 1104 (2009) ...................................13, 14, 16

*Cook v. City of Dallas*,
No. 3:12-CV-3788-P, 2014 WL 10728794, (N.D. Tex. June 25, 2014) ................................41

*Cook v. T-Mobile USA, Inc.*,
No. 3:14-CV-2907-P, 2015 WL 11120973 (N.D. Tex. June 2, 2015). ..................................41

*Corporan v. Wal-Mart Stores East, LP*,
No. 16-2305-JWL, 2016 WL 3881341, (D. Kan. July 18, 2016)................................8, 9, 18

*Cuvillier v. Taylor*,
503 F.3d 397, (5th Cir. 2007) .........................................................................................7, 41

*Dean v. United States*,
    556 U.S. 568, (2009) ................................................................10, 11

*Delana v. CED Sales, Inc.*,
    486 S.W.3d 316, (Mo. 2016) ............................................................15

*El Chico Corp. v. Poole*,
    732 S.W.2d 306, (Tex. 1987) ...........................................................36

*Englund v. World Pawn Exch.*,
    No. 16CV00598, 2017 WL 7518923, (Multnomah County, Or., June 30, 2017)....................9

*F.T.C. v. Accusearch, Inc.*,
    570 F.3d 1187, (10th Cir. 2009) ............................................19, 22, 23

*F.T.C. v. Accusearch, Inc.*,
    No. 06-CV-105-D, 2007 WL 4356786 (D. Wyo. Sept. 28, 2007) ....................22, 23

*F.T.C. v. Amazon.com, Inc.*,
    No. C14-1038-JCC, 2016 WL 10654030, (W.D. Wash. July 22, 2016)................19

*F.T.C. v. IFC Credit Corp.*,
    543 F. Supp. 2d 925, (N.D. Ill. 2008) ...........................................passim

*F.T.C. v. Neovi, Inc.*,
    604 F.3d 1150, (9th Cir. 2010) ............................................20, 22, 25

*F.T.C. v. Wyndham Worldwide Corp.*,
    799 F.3d 236, (3d Cir. 2015) ...........................................................42

*First Choice Fed. Credit Union v. Wendy's Co.*,
    No. 16-506, 2017 WL 9487086, (W.D. Pa. Feb. 13, 2017) ......................34

*Gill v. State of Texas*,
    153 F. App'x 261, (5th Cir. 2005).....................................................18

*Goldstein v. Earnest*,
    No. 37-2020-00016638, (Cal. Super. Ct. San Diego Cnty. July 2, 2021) ..............13

*Goodyear Atomic Corp. v. Miller*,
    486 U.S. 174, (1988) ......................................................................12

*Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*,
    313 F.3d 305, (5th Cir. 2002) .........................................................42

*Griggs v. Hinds Junior College*,
    563 F.2d 179, (5th Cir.1977) ..........................................................42

*Haqq v. Walmart Dep't Store*,
    No. EP-19-CV-00200-DCG, 2019 WL 4876958, (W.D. Tex. Oct. 3, 2019)........41

*Holcombe v. United States,*
    388 F. Supp. 3d 777, (W.D. Tex. 2019) ....................................35, 36

*Holmes v. Sec. Inv. Prot. Corp.*,
    503 U.S. 258, (1992) ......................................................................18

*Ileto v. Glock, Inc.*,
  565 F.3d 1126, (9th Cir. 2009) ......................................................................8, 14, 17

*In re Ambry Genetics Data Breach Litig.*,
  567 F. Supp. 3d 1130, (C.D. Cal. 2021) .................................................................33

*In re Arby's Rest. Grp. Inc. Litig.*,
  No. 1:17-CV-0514-AT, 2018 WL 2128441, (N.D. Ga. Mar. 5, 2018) .................................34

*In re Beck's North America, Inc.*,
  127 F.T.C. 379 (1999) ....................................................................................27

*In re Browning Arms Co.*,
  80 F.T.C. 749, 1972 WL 128729, (1972) .................................................................11

*In re Colt Indus. Operating Corp.*,
  84 F.T.C. 58, 1974 WL 175276, (1974) ..................................................................11

*In re Equifax, Inc., Customer Data Sec. Breach Litig.*,
  371 F. Supp. 3d 1150, (N.D. Ga. 2019) .................................................................33

*In re Ithaca Gun Co.*,
  78 F.T.C. 1104, 1971 WL 128515, (1971) ...............................................................11

*In re Katrina Canal Breaches Litig.*,
  495 F.3d 191, (5th Cir. 2007) .............................................................................7

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
  440 F. Supp. 3d 447, (D. Md. 2020) .....................................................................33

*In re Nat'l Housewares, Inc.*,
  90 F.T.C. 512, 1977 WL 189060, (1977) .................................................................11

*In re: The Home Depot, Inc., Customer Data Sec. Breach Litig.*,
  No. 1:14-md-2583-TWT, 2016 WL 2897520, (N.D. Ga. May 18, 2016) ...............................34

*In the Matter of AMF, Inc.*,
   95 F.T.C. 310, 1980 WL 338993 (1980) ................................................................24

*In the Matter of Int'l Harvester Co.*,
  104 F.T.C. 949, 1984 WL 565290, (1984) ...............................................................23

*In the Matter of Mego International*,
  92 F.T.C. 186, 1978 WL 206501 (1978) .................................................................24

*In the Matter of Retina-x Studios, LLC*,
  No. 172-3118, 2019 WL 5587282 (F.T.C. Oct. 17, 2019) ..........................................23

*In the Matter of Support King, LLC*,
  No. 192-3003, 2021 WL 4101690 (F.T.C. Aug. 26, 2021) .........................................23

*In the Matter of Uncle Ben's, Inc.*,
  89 F.T.C. 131, 1977 WL 188982 (1977) .................................................................24

*Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*,
  892 F.3d 719, (5th Cir. 2018) ...........................................................................40

*Jackson v. Johns-Manville Sales Corp.*,
  781 F.2d 394, (5th Cir. 1986) .............................................................................. 32

*Johnson v. Sw. Rsch. Inst.*,
  210 F. Supp. 3d 863, (W.D. Tex. 2016) .............................................................. 7

*King v. Klocek*,
  133 N.Y.S.3d 356, 187 A.D.3d 1614 (N.Y. App. Div. 2020); ........................... 9, 18

*Lively v. Carpet Servs., Inc.*,
  904 S.W.2d 868, (Tex. App. 1995) ...................................................................... 33

*McWane, Inc. v. F.T.C.*,
  783 F.3d 814 (11th Cir. 2015) ............................................................................. 21

*Menlo Inv. Grp., LLC v. Fought*,
  No. 3:12-CV-4182-K (BF), 2015 WL 547343, (N.D. Tex. Feb. 5, 2015) ........... 30

*Missouri Pac. R. Co. v. Am. Statesman*,
  552 S.W.2d 99, (Tex. 1977) ................................................................................. 31

*Nixon v. Mr. Prop. Mgmt. Co.*,
  690 S.W.2d 546, (Tex. 1985) .................................................................. 31, 35, 37, 40

*Orkin Exterminating Co., Inc. v. F.T.C.*,
  849 F.2d 1354, (11th Cir. 1988) ......................................................................... 20, 28

*Osti v. Saylors*,
  991 S.W.2d 322, (Tex. App. 1999) ...................................................................... 31

*Perdue v. Hy-Vee, Inc.*,
  455 F. Supp. 3d 749, (C.D. Ill. 2020) ................................................................. 33

*Perry v. S.N.*,
  973 S.W.2d 301, (Tex. 1998) .............................................................................. 30, 35

*Praesel v. Johnson*,
  967 S.W.2d 391, (Tex. 1998). ............................................................................. 29, 31

*Prescott v. Slide Fire Sols.*,
  410 F. Supp.3d 1123, (D. Nev. 2019) .......................................................... 13, 15, 17

*Purvis v. Aveanna Healthcare, LLC*,
  563 F. Supp. 3d 1360, (N.D. Ga. 2021) .............................................................. 34

*Reeder v. Daniel*,
  61 S.W.3d 359, (Tex. 2001) ................................................................................. 31, 34

*Ryder Integrated Logistics, Inc. v. Fayette Cnty.*,
  453 S.W.3d 922, (Tex. 2015) .............................................................................. 38

*Scanlan v. Texas A & M Univ.*,
  343 F.3d 533, (5th Cir. 2003) ............................................................................. 29

*Smith & Wesson Corp. v. City of Gary*,
  875 N.E.2d 422, (Ind. Ct. App. 2007) ................................................................ 9, 10

*Smith v. Merritt,*
940 S.W.2d 602, (Tex. 1997) ...................................................................34

*Soto v. Bushmaster Firearms,*
331 Conn. 53 (2019), *cert. denied*, 140 S.Ct. 513 (2019). ..............................passim

*Stanfield v. Neubaum,*
494 S.W.3d 90, (Tex. 2016) .........................................................37, 38, 40

*State of Texas v. Am. Tobacco Co.,*
14 F. Supp. 2d 956, (E.D. Tex. 1997) ...........................................................38

*Travis v. City of Mesquite,*
830 S.W.2d 94, (Tex. 1992) ...................................................................35

*United States v. Rayo-Valdez,*
302 F.3d 314, (5th Cir. 2002) ...................................................................16

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie,*
578 S.W.3d 506, (Tex. 2019) ...................................................................37

*Watkins v. Cornell Companies, Inc.,*
No. 3:11-CV-260-M-BN, 2013 WL 1914713, (N.D. Tex. Mar. 15, 2013), *report and recommendation adopted*, No. 3:11-CV-260-M-BN, 2013 WL 1926375 (N.D. Tex. May 8, 2013)...................................................................32

*Williams v. Beemiller, Inc.,*
100 A.D.3d 143, (N.Y App. Div.2012), *opinion amended on reargument*, 103 A.D.3d 1191 (2013) ...................................................................18

## STATUTES

15 U.S.C. § 26a ...................................................................10

15 U.S.C. § 45 ...................................................................passim

15 U.S.C. § 7901 ...................................................................15

15 U.S.C. § 7902 ...................................................................7

15 U.S.C. § 7903 ...................................................................passim

21 U.S.C. § 379s ...................................................................10

25 U.S.C. § 3406 ...................................................................10

Tex. Alco. Bev. Code § 2.03 (1987)...................................................................36

## OTHER AUTHORITIES

5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2002)...................................................................42

*Consumer*, Merriam-Webster Collegiate Dictionary (10th ed. 1994)...........................................21

*Customer*, Merriam-Webster Collegiate Dictionary (10th ed. 1994)..........................................25

FTC Policy Statement on Unfairness, Letter from FTC to Senators Wendell H. Ford & John C. Danforth (Dec. 17, 1980).......................................................................................................26

Retina-X Studios, LLC; Analysis to Aid Public Comment, 84 Fed. Reg. 58386-01 (Oct. 31, 2019)......................................................................................................................................24

Richard Starek III, "The ABCs at the FTC: Marketing and Advertising to Children" (July 25, 1997), available at: https://perma.cc/Z8YH-AHCB. ..............................................................24

Smith and Wesson 10K. Smith & Wesson 2022 Annual Report at 23, at https://perma.cc/EBE3-LMKZ......................................................................................................................................12

Support King, LLC; Analysis of Proposed Consent Order to Aid Public Comment, 86 Fed. Reg. 50357-02 (Sept. 8, 2021) ........................................................................................................24

Texas Pattern Jury Charges—General Negligence, Intentional Personal Torts & Workers' Compensation, at PJC 2.4 (2020 Ed.)...............................................................................37, 40

## INTRODUCTION

Plaintiffs are surviving family members of E.T., one of 19 children killed during the mass shooting at Robb Elementary School in Uvalde, Texas on May 24, 2022. Am. Compl., ECF No. 26 (hereafter "Complaint" or "Am. Compl."). E.T. was a vibrant 10-year girl who loved to laugh, play softball, watch TikToks, and play with animals. *Id*. ¶ 14. Her family mourns her loss deeply and seeks accountability for each individual and entity whose actions caused to her horrific death.

Daniel Defense is the company that armed the Uvalde shooter. On May 24, the shooter, who had never before used a gun, walked into a set of connected classrooms carrying a Daniel Defense DDM4 V7 AR-15 style semi-automatic rifle and used that gun to commit a massacre. *Id.* ¶¶ 2, 17. The Complaint alleges that Daniel Defense's marketing encouraged illegal misuse of its rifles in offensive, military-style operations, and that this unlawful marketing influenced the shooter and was a proximate cause of his heinous criminal actions and the grave harms that followed. *Id.* ¶ 45, 92, 97. The Complaint alleges in great detail how Daniel Defense has marketed its semi-automatic rifles—which are modeled after weapons carried by American troops—to adolescent and young men in a manner that encourages civilians to use those weapons as though they were in the armed forces: by engaging in illegal offensive combat missions directed at other humans. *Id.* ¶¶ 8, 47, 51. What happens when you sound the drums of war in a manner that especially appeals to isolated adolescent and young men? At least some will take that message and act on it—as was so tragically the case in Uvalde.

Daniel Defense attempts to deflect responsibility for its unconscionable advertising, seeking to assign blame to the shooter its advertisements targeted, so it may hide behind the Protection of Lawful Commerce in Arms Act ("PLCAA"). But the law recognizes that more than one party may bear legal responsibility for a shooting, and PLCAA does not protect unlawful

conduct. While PLCAA does shield members of the gun industry from certain lawsuits "for damages . . . resulting from the criminal or unlawful misuse of a [firearm or ammunition] by the person or a third party," it specifically and intentionally carves out several exceptions. Two are relevant here: (1) PLCAA does not apply to an action in which the defendant has knowingly violated a "State or Federal statute applicable to the sale or marketing" of guns or ammunition and that violation is "a proximate cause" (even if not the only proximate cause) of the ensuing harm; and (2) it does not apply to claims for negligence per se. Because the Complaint includes allegations that satisfy both of these exceptions, PLCAA's protections are rendered inapplicable.

Daniel Defense makes four main arguments for dismissal:

First, Daniel Defense argues that the Federal Trade Commission Act ("FTC Act")—the statute on which Plaintiffs rely to fit within PLCAA's predicate exception—is not "applicable to" the marketing of firearms. This is wrong. On its plain terms the predicate exception applies to marketing statutes and is not limited to only those statutes that "specifically" regulate the firearms industry. Indeed, not only is the FTC Act applicable to the sale and marketing of firearms—it *has* been applied to firearms companies on several occasions. *See infra* Section II. Moreover, the growing body of case law on this topic supports the conclusion that consumer protection laws that regulate the marketing and sale of products, including but not limited to firearms, qualify as "predicate statutes," removing the case from PLCAA protection.

Second, Daniel Defense argues that Plaintiffs have failed to plead a violation of the FTC Act. That is also wrong. As shown below, the FTC Act is a broad remedial statute that protects all "consumers"—a term of art that extends past the initial purchaser of a product and at least as far as individuals who were directly and foreseeably harmed by that purchaser. *See infra* Section III. Plaintiffs here are "consumers" who were directly and foreseeably harmed by Daniel Defense's

unlawful marketing that placed an extraordinarily lethal weapon into the hands of an 18-year-old with the suggestion that it was suitable to be used for offensive, combat-like missions against civilians—exactly what happened here.

Third, Daniel Defense argues that Plaintiffs' negligence per se claim fails as a matter of Texas common law. But Plaintiffs are within the class of persons protected by the FTC Act, and they suffered the type of harm the FTC Act was designed to prevent. Daniel Defense has cited no Texas case holding that the FTC Act is improperly used in a negligence per se action and Plaintiffs are aware of none. Instead, this court should follow the lead of Georgia—Daniel Defense's home state—and others that expressly permit the FTC Act to form the standard of care in a negligence per se action. *See infra* Section IV.

Finally, Daniel Defense argues that Plaintiffs have not adequately pled that Daniel Defense's unlawful actions proximately caused Plaintiffs' injuries. That is a question for a jury, and at this early stage, the allegations in the Complaint more than suffice to establish that Daniel Defense's conduct foreseeably was a proximate cause of the shooting at Robb Elementary School.

The most on-point decision in this area arises out of another horrific mass shooting, at Sandy Hook Elementary School in Newtown, Connecticut. *Soto v. Bushmaster Firearms*, 331 Conn. 53 (2019), *cert. denied*, 140 S.Ct. 513 (2019). There, like here, the families of slain children sued the manufacturer of the AR-15-style rifle used to carry out that massacre. *Id*. In *Soto*, the complaint alleged that "the defendants knowingly marketed, advertised, and promoted the [rifle] for civilians to use to carry out offensive, military style combat missions against their perceived enemies[]," *id*. at 65-66 and that this marketing was a proximate cause of the plaintiffs' injuries. *Id*. at 94-100. The firearm manufacturer in the case argued that it was immune from suit under PLCAA and that there was no violation of an unfair trade practices law (in that case, the

3

Connecticut Unfair Trade Practices Act). The *Soto* court rejected every one of these arguments, holding that "PLCAA d[id] not bar the plaintiffs' wrongful marketing claims" where the plaintiffs had alleged that the firearms manufacturer had "encouraged consumers to use the weapons … to launch offensive assaults against their perceived enemies," and allowed the case to proceed. *Id*. at 157-58. Plaintiffs urge this Court to follow the *Soto* court's careful, thorough, and persuasive analysis—which is supported by numerous other precedents cited below—and allow Plaintiffs the opportunity to prove their case.

*** 

At bottom, this case is simple: PLCAA does not shield a firearms manufacturer that violates the law. Plaintiffs do not seek to hold Daniel Defense accountable for anyone's conduct but its own; indeed, Plaintiffs have sued numerous other defendants as well, for their role in causing the shooting. But Daniel Defense played an essential role in arming the Uvalde shooter and the allegations in the Complaint are more than sufficient to survive this motion to dismiss.

## BACKGROUND

The Complaint alleges that Daniel Defense's marketing encourages the illegal and unreasonably dangerous misuse of the firearms it sells, including the DDM4 V7, which was used to kill E.T. Am. Compl. ¶¶ 8, 44. The DDM4 V7 is an AR-15-style rifle, which is an especially lethal rifle based on a weapon used in warzones. *Id*. ¶¶ 50-51. It is designed to inflict—and in the Uvalde school shooting did inflict—horrific carnage in the bodies of its victims. *Id*. ¶¶ 95-96.

The claims here against Daniel Defense arise out its unfair marketing of this lethal weapon, which it advertises in a manner calculated to appeal to civilians attracted to the "thrill, excitement, and violence of combat," by emphasizing its utility for offensive, military combat, even though that is not a lawful civilian use of such a weapon. *Id*. ¶¶ 52-53. As the Complaint details with

images and text, the marketing encourages purchasers to acquire Daniel Defense rifles and to use them to carry out offensive combat-type missions. *Id*. ¶¶ 53-63.

For example, in one social media post from March 2, 2022—just months before the Uvalde shooting—Daniel Defense posted a picture of a sniper rifle "targeting a car on a public street as if to carry out an assassination." *Id.* ¶ 54. In response to this post, an Instagram user asked: "Is this an assassins setup? And can I buy this?" Am. Compl. ¶ 54. The official response from Daniel Defense? A comment "that 'anyone' could use this 'assassin's setup'" and a note that the setup was available for purchase on Daniel Defense's website. *Id.* Put differently, Daniel Defense planted the idea of using their weapons to carry out an assassination and then told a person where to buy the right gun and accessories for the task. Another social media post, captioned "Saturdays are for the boys," shows men in military fatigues, apparently carrying out a combat operation aboard a cargo ship armed with Daniel Defense AR-15-style rifles. *Id.* ¶ 55.

The Complaint alleges that Daniel Defense's website explains "that the 'M4' in 'DDM4 V7' is a nod to the 'iconic M4 carbine used by U.S. military forces,'" and describes this rifle as "extremely maneuverable and easy to move around barriers." *Id*. ¶ 50. In addition to Instagram and print content, Daniel Defense's marketing includes videos that combine "footage of a civilian target shooter with footage of what appears to be an armed military team moving in formation" and another video portraying "a (fictional) military raid on a campus of abandoned buildings, one of which appears to be a former school building . . . featur[ing] sweeping shots of a dramatic helicopter arrival, professional stunt work, and suspense-building soundtrack, all in the name of promoting Daniel Defense's rifles as military-grade, special-operations-approved weapons available to civilians." *Id*. ¶¶ 60-61. And Daniel Defense uses its marketing to extoll the combat capabilities of its AR-15-style rifles. *See, e.g.*, *id.* ¶¶ 56, 58, 63. These and other Daniel Defense

social media posts cited in the Complaint and showing civilians that their guns are ready for illegal civilian combat use are attached as Appendix A. *See also* Am. Compl. ¶¶ 53-63.

The Complaint further alleges that Daniel Defense knows that young men are the "group most likely to internalize Daniel Defense's promotion of the illegal offensive civilian use of rifles" and thus tries to appeal to this group through marketing tied to first-person shooter video games (like *Call of Duty*), memes, and pop culture. Am. Compl. ¶¶ 64-73, 74. For example, one of Daniel Defense's guns "is featured in *Call of Duty: Modern Warfare*, and the company's social media account references and tags *Call of Duty* in many of its posts." *Id.* ¶ 64. Additionally, "Daniel Defense's marketing draws on pop culture themes and relies on online meme culture to attract teens. . . ." *Id.* ¶ 68. Daniel Defense chooses not to use "age-gating" to limit access to its social media accounts. *Id.* ¶ 47. "This strategy makes it more likely that the demographic most likely to be susceptible to the message that these weapons are suitable for offensive use—young men—are the ones who are likely to view and internalize this message." *Id*. ¶ 68.

This marketing strategy worked when the shooter, a teenager who had never used a firearm prior to the massacre in Uvalde, was drawn by Daniel Defense's marketing to its online store on his eighteenth birthday, where he spent over $2,000 to buy the DDM4 V7 without first holding or firing it. *Id*. ¶¶ 7, 92, 101. The shooter was an ideal customer for Daniel Defense: young, troubled, open to the message that guns can and should be used for illegal purposes and drawn to the fantasy of reenacting video game combat in real life. *Id.* ¶¶ 8, 48. The shooter reportedly associated military service with killing people, was obsessed with *Call of Duty*, and was a heavy user of social media. *Id.* ¶¶ 88, 91. Daniel Defense was not a household name, and the shooter knew little about guns. *Id*. ¶ 7. The Complaint alleges the shooter sought out a Daniel Defense rifle because of his "exposure to Daniel Defense's marketing" on social media and in video games, and that marketing

6

was a proximate cause that led the shooter to "purchase and then use one of [Daniel Defense's] most lethal weapons so carry out the massacre at Robb Elementary School." *Id.* at ¶ 92.

## STANDARD OF REVIEW

"In deciding a 12(b)(6) motion, a 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Cervini v. Cisneros*, 593 F. Supp. 3d 530, 533 (W.D. Tex. 2022) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)). "Under Rule 12(b)(6), a claim should not be dismissed unless the court determines that it is beyond doubt that the plaintiff cannot prove a plausible set of facts that support the claim and would justify relief." *Johnson v. Sw. Rsch. Inst.*, 210 F. Supp. 3d 863, 867 (W.D. Tex. 2016) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In other words, "[t]o survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cervini*, 593 F. Supp. 3d at 533 (quoting *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007)).

## ARGUMENT

## I.      Overview of the Protection of Lawful Commerce in Arms Act

PLCAA provides that "[a] qualified civil liability action may not be brought in any Federal or State court." 15 U.S.C. § 7902(a). A "qualified civil liability action" is defined as:

> [A] civil action . . . brought by any person against a manufacturer or seller of a qualified product . . . for damages . . . or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party. . . .

*Id.* § 7903(5)(A). Plaintiffs do not dispute that, if this case did not fit into one of PLCAA's exceptions, it would be a "qualified civil liability action" and dismissal would be warranted. But

there are six exceptions to PLCAA's protection, and the Complaint fits within two of them: (i) the so-called "predicate exception" and (2) the negligence per se exception. *Id.* § 7903(5)(A)(ii)-(iii).

The predicate exception allows a plaintiff to bring a case against a manufacturer or seller that has knowingly violated a state or federal statute "applicable to the . . . marketing of" firearms:

> The term "qualified civil liability action" . . . shall not include **an action in which a manufacturer** or seller **of a qualified product knowingly violated a** State or **Federal statute applicable to the** sale or **marketing of the product**, and the violation was a proximate cause of the harm for which relief is sought, including—
>
> (I) any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a qualified product; or
>
> (II) any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of title 18[.]

*Id.* § 7903(5)(A)(iii) (emphasis added). "This exception has come to be known as the 'predicate exception,' because a plaintiff not only must present a cognizable claim, he or she also must allege a knowing violation of a 'predicate statute.'" *Corporan v. Wal-Mart Stores East, LP*, No. 16-2305-JWL, 2016 WL 3881341, at *2 (D. Kan. July 18, 2016) (quoting *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1132 (9th Cir. 2009)).

A violation of the predicate statute is a threshold requirement, and once satisfied, the door is open for the plaintiff to bring a common law claim that is predicated on that violation, like Plaintiffs' negligence claim here. *See, e.g., Corporan*, 2016 WL 2881341, at *2 ("[P]laintiff's state law negligence claims must fall into one [of] the exceptions enumerated in the PLCAA before

8

plaintiff will be permitted to proceed with her claims."); *King v. Klocek*, 133 N.Y.S.3d 356, 359 (N.Y. App. Div. 2020); *Smith & Wesson Corp. v. City of Gary*, 875 N.E.2d 422, 434-35 (Ind. Ct. App. 2007) (permitting negligence claim to go forward under the predicate exception). The predicate statute that Plaintiffs rely on here is the FTC Act, which as explained in Section III, prohibits unfair and deceptive marketing practices.[1]

The negligence per se exception is more straightforward: a plaintiff is permitted to sue a seller of firearms or ammunition for negligence per se, and courts have interpreted this exception to follow the forum state's law on negligence per se liability.[2] *See, e.g.*, *Corporan*, 2016 WL 2881341, at *4-5 (evaluating the claim under the relevant state law).

## II. Plaintiffs' Allegations That Daniel Defense Violated the FTC Act Satisfy the Predicate Exception.

Daniel Defense argues that the FTC Act cannot serve as a predicate statute because it is not "specifically applicable" to the marketing of firearms and because it does not have a private right of action. But on examination, the FTC Act is precisely the type of statute that Congress envisioned serving as a predicate statute when it enacted PLCAA.

---

[1]    Because Plaintiffs have sufficiently alleged a knowing violation of law (the FTC Act) applicable to the sale and marketing of firearms, the predicate exception brings *the entire case* outside the scope of PLCAA's protection. The Court does not need to analyze each of Plaintiffs' causes of action separately; once the elements of the predicate exception are satisfied, PLCAA does not apply to the entire "action" or case. *See* 15 U.S.C. § 7903(5)(A)(iii) (exempting "*an action in which* a manufacturer or seller . . . knowingly violated state" or federal laws applicable to sale or marketing of firearms) (emphasis added); *see also Corporan*, 2016 WL 3881341, at *4 n.4 (declining to engaged in a "claim-by-claim analysis" to determine whether each claim fit into PLCAA's enumerated exceptions because the conduct applied in the complaint "falls within the predicate exception"); *Englund v. World Pawn Exch.*, No. 16CV00598, 2017 WL 7518923, at *4, *6 (Multnomah County, Or., June 30, 2017) (same); *Chiapperini v. Gander Mountain Co.*, 13 N.Y.S.3d 777, 787 (N.Y. Sup. Ct. 2014) (same).

[2]    This exception applies because Daniel Defense has conceded that it is a seller for PLCAA purposes. Am. Mot. to Dismiss, ECF No. 35, filed Mar. 9, 2023 ("Def. Br."), at 8 n. 7.

### A. The FTC Act is "applicable to the . . . marketing of" firearms and thus is a predicate statute.

The first issue Daniel Defense raises is whether the FTC Act is "applicable to the . . . marketing" of firearms. Def. Br. at 11-16. A close reading of the text and structure of PLCAA makes plain that the FTC Act meets this standard.

This Court should "start, as always, with the language of the statute." *Dean v. United States*, 556 U.S. 568, 572 (2009) (citation omitted). While the phrase "applicable to" is undefined in PLCAA, "the principal definition of 'applicable' is simply 'capable of being applied.'" *Soto*, 331 Conn. at 119 (cleaned up). Thus, on a natural reading, the predicate exception applies "to a violation of any law that is capable of being applied to the sale and marketing of firearms." *Id.*; *see also Smith & Wesson Corp.*, 875 N.E.2d at 431 (same).

Daniel Defense asserts, with almost no attempt to parse the text of the statute, that "the predicate exception only applies to statutes that ***specifically*** regulate the sale and marketing of firearms." Def. Br. at 11 (emphasis in original). Indeed, throughout its brief, Daniel Defense refers to statutes that are "specifically applicable" to the marketing of firearms or that "specifically regulate" firearms. *See, e.g.*, Def. Br. at 11, 15. But if Congress had meant "specifically applicable," "it easily could have used such language," rather than the word Congress did choose, "'applicable,' which is susceptible to a broad reading." *Soto*, 331 Conn. at 120.[3] While some secondary dictionary definitions define the word "applicable" as "fit, suitable, or right to be applied: appropriate. . .relevant. . .," these definitions also embrace statutes like the FTC Act that

---

[3]     Importantly, other federal statutes use this sort of restrictive language—Congress knows how to restrict when it wants to. *See, e.g.*, 21 U.S.C. § 379s ("*specifically applicable* to a particular cosmetic or class of cosmetics under this chapter") (emphasis added); 25 U.S.C. § 3406(d)(2)(B) ("*specifically applicable* to Indians") (emphasis added); 15 U.S.C. § 26a(b)(1) ("*specifically applicable* to the sale of petroleum products") (emphasis added).

10

are suitable to be applied to the marketing of firearms. *Id.* (internal citation omitted). There is simply no basis to graft the word "specifically" onto the predicate exception's "applicable to" language. *Dean*, 556 U.S. at 572 ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face." (citation omitted)).

In addition, the predicate exception, by its express terms, applies to statutes regulating the "*marketing* of" firearms. At the time PLCAA was passed, there were no federal laws specifically regulating the marketing of firearms (nor is there one now). *Soto*, 331 Conn. at 121-22. "It would have made little sense for the drafters of the legislation to carve out an exception for violations of laws applicable to the marketing of firearms if no such laws existed." *Id.* at 122. Instead, the only sensible reading of the predicate exception is that Congress had in mind the FTC Act and similar state laws that prohibit unfair or deceptive marketing practices by the gun industry. *Id.* at 121-29.

On its face, the FTC Act is broad enough to encompass the marketing of firearms. It states: "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive act or practices in or affecting commerce, are hereby declared unlawful." 15 U.S.C. § 45(a)(1). Congress specifically exempted certain industries from the FTC Act's mandates, including "savings and loan institutions," "Federal credit unions," and "common carriers." *Id.* § 45(a)(2). Unlike these identified industries, firearms manufacturers and dealers were not exempted, although they could have been. This decision by Congress speaks volumes.

At the time of PLCAA's passage, the FTC Act had been applied repeatedly to firearms manufacturers. *See In re Colt Indus. Operating Corp.*, 84 F.T.C. 58, 1974 WL 175276, at *2 (1974) (consent decree between FTC and firearms manufacturer over distribution and pricing practices); *In re Browning Arms Co.*, 80 F.T.C. 749, 1972 WL 128729, at *1-2 (1972) (same); *In re Ithaca Gun Co.*, 78 F.T.C. 1104, 1971 WL 128515, at *1-2 (1971) (same); *In re Nat'l Housewares, Inc.*,

90 F.T.C. 512, 1977 WL 189060, at *2-4 (1977) (FTC Order prohibiting misleading advertising for a company that marketed various products including firearms). This Court can "presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184 (1988).[4] The FTC Act thus fits squarely within the category of statutes "applicable to the . . . marketing of" firearms—even under a narrow definition of "applicable."

Plaintiffs' position that the FTC Act is "applicable to" the marketing of firearms is firmly supported by the growing body of case law on this subject. As noted above, the *Soto* plaintiffs relied upon the Connecticut Unfair Trade Practices Act ("CUTPA") as a predicate statute. 331 Conn. at 85-86. CUTPA "is modeled after the FTC Act" and the federal law "serve[s] as a lodestar" in interpreting CUTPA. *Id*. at 113-14, 151. The Supreme Court of Connecticut concluded that "PLCAA does not bar the plaintiffs' wrongful marketing claims and that, at least to the extent that [CUTPA] prohibits the unethical advertising of dangerous products for illegal purposes, CUTPA qualifies as a predicate statute." *Id*. at 157-58. Because of the similarities between the FTC Act and CUTPA, the *Soto* court's detailed and comprehensive analysis—which tracks the arguments made above—applies not only to CUTPA, but also to the FTC Act. *Id.* at 113-16, 121-30, 131-32. Indeed, the *Soto* court itself relied heavily on the history and application of the FTC Act in reaching its conclusion. *Id.* at 131-32 (explaining that "it is well established that the FTC Act and state analogues. . .not only govern the marketing of firearms, but also prohibit advertisements that promote the unsafe or illegal use of potentially dangerous products").[5]

---

[4]     The FTC has more recently investigated firearms manufacturers as well. *See* Smith and Wesson 10K. Smith & Wesson 2022 Annual Report at 23, at https://perma.cc/EBE3-LMKZ.

[5]     The sole basis that Daniel Defense provides in its opening brief for distinguishing *Soto* from this case is that CUTPA contains a private right of action while the FTC Act does not. Def. Br. at 16 n.13. That argument is irrelevant for the reasons explained fully below. *See Infra* Section

Other cases have reached the same conclusion as *Soto*, namely that a marketing statute like the FTC Act that is not expressly limited to the firearms industry can form the basis of a predicate violation under PLCAA. *See Prescott v. Slide Fire Sols.*, 410 F. Supp.3d 1123, 1137-39 (D. Nev. 2019) (finding that Nevada's Deceptive Trade Practices Act qualifies as a predicate statute); *Goldstein v. Earnest*, No. 37-2020-00016638, slip op. at *3-5 (Cal. Super. Ct. San Diego Cnty. July 2, 2021) (attached as Appendix B hereto) (holding that California Unfair Competition Law is a predicate statute).

### B. Daniel Defense's arguments for limiting the scope of the predicate exception fail.

Daniel Defense makes several arguments in support of an interpretation of the predicate exception that would limit what statutes could serve as predicates. Def. Br. at 10-15. Their arguments misread the text of the statute and misapprehend key precedent.

In support of its argument that a generally applicable marketing statute cannot be a predicate statute, Daniel Defense misstates the holdings and reasoning of two federal appellate cases that interpreted the phrase "applicable to" in the predicate exception. First, Daniel Defense relies on *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384 (2d Cir. 2008), *cert. denied*, 556 U.S. 1104 (2009), but conspicuously omits key portions of that ruling, including that the court *rejected* Daniel Defense's core argument that the predicate exception applies only to statutes that "**specifically regulate** firearms" Def. Br. at 15 (emphasis in original). To the contrary, the *Beretta* court found "nothing in the statute that requires any *express language* regarding firearms to be included in a statute in order for that statute to fall within the predicate exception," and therefore

---

II.C. The fact that a statute does not provide a private right of action is of no moment to the question of whether such a statutory violation can satisfy the predicate exception. It is notable that Daniel Defense does not assert in its brief that *Soto* is distinguishable in its analysis of the "applicable to" language in PLCAA.

"decline[d] to foreclose the possibility that, under certain circumstances, state courts *may apply a statute of general applicability* to the type of conduct that the City complains of, in which case such a statute might qualify as a predicate statute." 524 F.3d. at 399-400 (emphasis added). To this end, the *Beretta* court identified three categories of predicate statutes: (1) statutes "that expressly regulate firearms;" (2) statutes "that courts have applied to the sale and marketing of firearms;" and (3) statutes "that do not expressly regulate firearms but that clearly can be said to implicate the purchase and sale of firearms." *Id*. at 403-04. The FTC Act easily falls within the bounds of categories (2) and (3). *See Soto*, 331 Conn. at 126-29 (concluding that "the most reasonable reading of the statutory framework, in light of the decision of the Second Circuit in *New York v. Beretta U.S.A. Corp* [], is that laws such as CUTPA," like the FTC Act, "qualify as predicate statutes").

Next, Daniel Defense overreads the Ninth Circuit's decision in *Ileto v. Glock*. 565 F.3d at 1134. The plaintiffs there—in contrast to the theory of this case—argued that California's tort law, which had been codified into statutes, "provide[d] both the cause of action and the requisite predicate statute under the PLCAA." *Id*. at 1133. Examining PLCAA's context, the court noted that "Congress clearly intended to preempt common-law claims," and the plaintiffs' predicate statutes were simply codifications of "classic negligence and nuisance" torts. *Id*. at 1135-36. Thus, the court concluded that these "general tort theories of liability" were preempted by PLCAA, "even in jurisdictions, like California, that have codified such causes of action." *Id. Ileto*'s reasoning does not apply here because Plaintiffs' predicate statute—the FTC Act—is not a codification of the common law or a general theory of tort liability. Notably, the *Ileto* court rejected the defendant's argument there that the predicate exception was limited only to statutes that exclusively pertained to firearms. *Id*. at 1135-36. And indeed, as noted above, a district court within the Ninth Circuit— applying *Ileto*—reached the conclusion that Nevada's consumer protection statute, which bears

similarities to the FTC Act, was a predicate statute. *Prescott*, 410 F. Supp. 3d at 1137-39 (finding that the "NDTPA specifically regulates the sale and marketing of goods" and that "*Ileto* does not foreclose the NDTPA from serving as a predicate statute, and instead appears to permit it").[6]

Daniel Defense next argues that the examples of predicate statutes listed in PLCAA are intended to restrict the scope of the predicate exception such that "[o]nly statutes like those listed— that particularly regulate the *manufacture and sale* of firearms—qualify as predicate statutes." Def. Br. at 15-16 (emphasis added). Again, Daniel Defense misreads PLCAA and key precedent. The examples listed in the predicate exception involve statutes relating to the sale of firearms, namely the federal and state laws prohibiting the making of false entries in firearms records, and the federal statute prohibiting the sale or transfer of a gun or ammunition to someone who is federally prohibited from possessing a gun or ammunition, as well as aiding and abetting and conspiracy to violate those laws. 15 U.S.C. § 7903(5)(A)(iii)(I)-(II). Neither of these statutes relate to marketing; but PLCAA says that marketing statutes can be predicates, meaning these two examples are merely illustrative. Daniel Defense's contention that these examples limit the exception to laws regulating the "*manufacture and* sale of firearms," Def. Br. at 16 (emphasis added), shows the limits of these two examples: they make clear (as detailed below) that a predicate statute need not have a private

---

[6]     Daniel Defense has quoted findings and purposes included as a preamble to PLCAA and passages from *Beretta* and *Ileto* that reference PLCAA's findings. Def. Br. at 4-6, 12-14. But "[t]he general statement of purpose of the PLCAA does not redefine the plain language of a statute" and "does not overcome . . . the specific substantive provisions of the PLCAA." *Delana v. CED Sales, Inc*., 486 S.W.3d 316, 322 (Mo. 2016) (citation omitted). The Court should hew to the text, which, as explained above, does not restrict the predicate exception to statutes that "specifically regulate" firearms.

        Even were the Court to look to the statement of purpose, it simply makes plain that PLCAA was passed to combat a perceived judicial expansion of liability standards applicable to the firearms industry while preserving legislative regulation. *See, e.g.*, 15 U.S.C. § 7901(a)(7)-(8). Congress did not intend to cut off claims like the one brought here, which is based on the harm directly caused by Daniel Defense's violations of a regulatory statute (the FTC Act).

right of action, but they do not define what a predicate statute is. That work is done by the plain description found in the text—"a State or Federal statute applicable to the sale or marketing of the product." 15 U.S.C. § 7903(5)(A)(iii). To find otherwise, would require this Court to read "marketing" out of the statute. *See United States v. Rayo-Valdez*, 302 F.3d 314, 318 (5th Cir. 2002) ("[W]hen interpreting a statute, it is necessary to give meaning to all its words and to render none superfluous.").[7]

Moreover, though Daniel Defense cites *Beretta*'s discussion of the example predicate statutes (applying the doctrine of *noscitur a sociis*), as discussed above, the *Beretta* court's conclusion was that the predicate exception was broad enough to include statutes of general applicability that have been "applied to the . . . marketing of firearms" or that "clearly can be said to implicate the purchase and sale of firearms." 524 F.3d at 404. *Soto* similarly rejected an argument that "all predicate statutes must be of [the] same ilk" as the "two examples of predicate federal statutes." 331 Conn. at 138-39.

### C. A predicate statute need not be privately enforceable.

Just like PLCAA's example predicate statutes, the FTC Act does not have a private right of action. Daniel Defense makes two related arguments premised on the FTC Act's lack of a private right of action: First, that Plaintiffs lack standing to enforce it; and second, that Federal

---

[7]     As detailed at length in the *Soto* decision, the two predicate violation examples were added into PLCAA "for purposes of emphasis or in response to recent, high profile events, rather than to restrict the scope of coverage." 331 Conn. at 143. Specifically, the *Soto* court explained that the specific record keeping examples were added to PLCAA to make it clear that a pending case related to sniper attacks that had been terrorizing Washington D.C. would be able to go forward. *Id*. at 142-43. Thus, the examples were included to clarify one question, but were not intended to limit the scope of the exception generally. *Id.*

—

Trade Commission ("FTC") alone can enforce the FTC Act, so this Court lacks jurisdiction over the claim. Def. Br. at 16-18.[8]

On the standing point, the fact that the FTC Act does not provide for a private right of action does not mean that a violation of that Act cannot serve as a PLCAA predicate statute. The predicate exception requires that a plaintiff plead a "knowing violation of a 'predicate statute,'" *in addition* to a "present[ing] a cognizable claim." *Ileto*, 565 F.3d at 1132. It can be the case that one statute provides both the violation and the cause of action (that was the case in *Soto*, where the plaintiffs brought suit under CUTPA). But it is also permissible under PLCAA for a plaintiff to plead a violation of a statute that serves as the predicate violation that is separate from the common-law cause of action.

The argument that a private right of action is necessary for a predicate statute was considered and rejected in *Prescott*. 410 F. Supp. 3d 1123. There, the plaintiff brought a negligence claim (in addition to others), and the court held that a common-law negligence claim *predicated* on a violation of the Nevada Deceptive Trade Practices Act (NDTPA), which (like the FTC Act) did not contain a private right of action, satisfied the predicate exception. *Id.* at 1137-1142. The court found the examples in the predicate exception that pertain to violations of criminal law statutes that did not contain private rights of action were "illustrative" and concluded that "PLCAA's language does not appear to state[] that a lack of standing to pursue a private cause of action under the NDTPA would then bar the NDTPA from serving as a predicate statute." *Id*. at 1139 n.9. Instead, a violation of the NDTPA "open[ed] the door for civil liability on other claims as long as the violation of the predicate statute proximately caused the plaintiff's harm." *Id*. So too

---

[8]     It bears note that Daniel Defense filed a Rule 12(b)(6) motion only, not a motion under Rule 12(b)(1), which is the appropriate procedural vehicle for filing a motion based on lack of jurisdiction as Daniel Defense purports to do with these arguments.

here. Plaintiffs have pled a violation of the FTC Act that was a proximate cause of their injuries, and that "opens the door for civil liability on other claims"—here, Plaintiffs' negligence claim.[9]

Daniel Defense conflates Plaintiffs' cause of action (for negligence) with the predicate violation (under the FTC Act) to argue that because the FTC Act does not provide a right of action, Plaintiffs lack standing to bring this claim. But Plaintiffs have brought a negligence cause of action—not an FTC Act claim—and they plainly have standing to sue in negligence. Courts have uniformly permitted common-law causes of action predicated on violations of criminal laws that do not contain a private right of action. *See, e.g.*, *Williams v. Beemiller, Inc.*, 100 A.D.3d 143, 149 (N.Y App. Div.2012), *opinion amended on reargument*, 103 A.D.3d 1191 (2013) (permitting negligence and public nuisance claims predicated on violations of the criminal provisions of the Gun Control Act); *King v. Klocek*, 187 A.D.3d 1614 (N.Y App. Div. 2020) (permitting common-law claims that were predicated on violations of Gun Control Act and New York Penal Law § 270.00); *Corporan*, 2016 WL 3881341, at *3-6 (permitting common-law claims that were predicated on criminal provisions in the Gun Control Act).

Similarly flawed is Daniel Defense's argument that because only the FTC may enforce the FTC Act, the law cannot serve as a predicate. PLCAA's example predicate statutes are criminal statutes, and only the government may bring a prosecution for a violation of a criminal statute. *See Gill v. State of Texas*, 153 F. App'x 261, 262 (5th Cir. 2005). And as noted above, federal criminal statutes are routinely used as PLCAA predicates. *Cf. Holmes v. Sec. Inv. Prot. Corp.,* 503 U.S.

---

[9]     A second text-based reason leads to this conclusion: the predicate exception does not refer to "claims for a knowing violation of a State or Federal Statute," but to "an action *in which* a manufacturer or seller … knowingly violated" a predicate statute. 15 U.S.C. § 7903(5)(A)(iii) (emphasis added); *see contra* § 7903(5)(A)(ii) (exempting an action "for negligent entrustment or negligence per se). The predicate exception is thus not limited to cases in which a plaintiff brings a claim *for* statutory violations for which he or she has private right of action.

258, 280 (1992) (O'Connor, J. concurring) ("If standing were to be determined by reference to the predicate offenses, a private RICO plaintiff could not allege as predicates many of the acts that constitute the definition of racketeering activity. The great majority of acts listed [as RICO predicates] are criminal offenses for which only a State or the Federal Government is the proper party to bring suit."). Since criminal statutes enforceable only by the government can be PLCAA predicates, it follows that the FTC Act can also serve as a PLCAA predicate statute.

### III.  Plaintiffs Have Alleged Violations of the FTC Act's Unfairness Standard.

Daniel Defense argues that the Complaint fails to allege facts sufficient to show that its marketing violated the FTC Act's prohibition on unfair practices. Def. Br. At 18-27. But these arguments are premised on a misunderstanding of the FTC Act's use of the term "consumer." Plaintiffs—who are consumers as that term is used in the FTC Act—have more than met their burden of alleging that Daniel Defense's marketing practices violated the FTC Act.

### A.  Overview of the FTC Act's unfairness standard

The FTC Act "declare[s] unlawful" any "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). An unfair act or practice is one that: "[1] causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers themselves and [3] not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n). These three elements are all that is required to establish a violation of the FTC Act's prohibition of unfair acts. *F.T.C. v. Amazon.com, Inc.*, No. C14-1038-JCC, 2016 WL 10654030 at *6 (W.D. Wash. July 22, 2016). It is unnecessary to show that the practice or act violates a separate law, although, of course, "violations of law may be relevant to the unfairness analysis." *F.T.C. v. Accusearch, Inc.*, 570 F.3d 1187, 1194 (10th Cir. 2009). And it is unnecessary

to show that the company had knowledge of the harm it was causing. *F.T.C. v. Neovi, Inc.*, 604 F.3d 1150, 1156 (9th Cir. 2010).

With respect to the second element, an injury is reasonably avoidable if "consumers may act to avoid injury before it occurs," a question that turns on whether "they have reason to anticipate the impending harm and the means to avoid it." *Orkin Exterminating Co., Inc. v. F.T.C.*, 849 F.2d 1354, 1365 (11th Cir. 1988) (internal quotation marks omitted). Courts have also held that a harm is reasonably avoidable if consumers "may seek to mitigate the damage afterward if they are aware of potential avenues toward that end." *Id*.

### B. The FTC Act uses "consumer" to encompass purchasers *and* others harmed by the seller's conduct.

Daniel Defense argues that Plaintiffs have "fail[ed] to plead an essential element of an unfair act or practice—that the harm was not 'reasonably avoidable' by the consumer himself" and that Plaintiffs "can never plead this element." Def. Br. at 20-21. These arguments rely upon Daniel Defense's contention that "consumer" is limited to the individual purchaser of the product (here, the shooter), but none of the authority relied upon by Daniel Defense supports this position, and, indeed, some of the cases it cites directly contradict it. The case law, along with the text of the statute and legislative history, affirms that "consumer" is a broad category that extends beyond the individual purchaser to third parties directly and foreseeably harmed by the purchaser's encouraged misuse of the seller's product.

#### i. The text of the statute supports a broad definition of "consumer."

Both the text and the history of the FTC Act "demonstrate that Congress's intent was to limit the Commission's authority to proscribe *unfair* acts and practices *not* through a restrictive definition of 'consumer,' but rather through [the FTC Act's] requirement that an unfair practice must cause substantial harm that is not reasonably avoidable or outweighed by countervailing

benefits to consumers or competition." *F.T.C. v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 937 (N.D. Ill. 2008) (emphasis in original).[10] The FTC Act does not expressly define "consumer," and so the ordinary dictionary definition of consumer from 1994 (when the FTC Act was amended to define an unfair practice) applies. *See Bostock v. Clayton County, GA.*, __ U.S. __, 140 S.Ct. 1731, 1738 (2020) ("This Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment."). Thus, a consumer is simply "one that utilizes economic goods." *Consumer*, MERRIAM-WEBSTER COLLEGIATE DICTIONARY 249 (10th ed. 1994).

Had Congress wanted to limit the statute's reach so that it only applied when the actual purchaser was harmed by the unfair practice, it could have chosen a narrower word than consumer, such as "customer," "purchaser," or "buyer." The effect would have been to require that the person harmed by the unfair practice have been privy to the transaction. But Congress chose a broad term, and that choice must be given effect.[11] Additionally, Congress's use of the plural form ("consumers" rather than "the consumer") suggests that Congress had in mind a larger class of people who might be harmed by the unfair trade practices than an individual purchaser. Finally, limiting "consumer" to direct purchasers would produce an absurd result: Unfair trade practices that harm buyers of a product would be unlawful, but unfair trade practices that encourage or allow purchasers to misuse a product in a way that foreseeably harms third parties would be permitted. That cannot be what Congress intended. *See Carpenters Dist. Council of New Orleans & Vicinity*

---

[10]    As further evidence that Congress deliberately chose a broad term ("consumer" rather than "purchaser"), 15 U.S.C. § 45 addresses both competition and consumer protection matters, and in monopoly and other competition cases the harmed party is often not the purchaser, but a broader category of consumers. *See, e.g., McWane, Inc. v. F.T.C.*, 783 F.3d 814 (11th Cir. 2015).

[11]    Congress knows that it can define consumer more narrowly—in at least one other statute enforced by the Federal Trade Commission, Congress expressly defined "consumer" as limited to the actual purchaser of a good (which made sense in the context of that statute, which regulated warranties)—but it chose not to expressly define "consumer" even as it repeatedly amended the FTC Act. *See IFC Credit Corp.*, 543 F. Supp. 2d at 936-39.

*v. Dillard Dep't Stores, Inc.*, 15 F.3d 1275, 1285 (5th Cir. 1994) ("A well-accepted canon of statutory construction requires the reviewing court to avoid any interpretation that would lead to absurd or unreasonable outcomes.").

### ii. Federal courts have upheld agency enforcement actions for harm to non-purchasers.

Numerous decisions confirm that the FTC Act is broad enough to apply to instances—like this case—in which the harmed consumers were not purchasers. In *F.T.C. v. Neovi, Inc.*, the FTC brought an enforcement action against a company that allowed users to create an online account and then use that account to issue checks. 604 F.3d at 1153. Because the company made it easy to open an account, "it was a simple matter for unscrupulous opportunists to obtain identity information and draw checks from accounts that were not their own." *Id.* at 1154. The victims were not customers of the company, but rather victims of criminal identity theft carried out by the company's customers. Nevertheless, the Court of Appeals had no trouble concluding that consumers were substantially injured and that they could not reasonably avoid that injury. *Id.* at 1158 (holding that there was no "material issue of fact as to whether consumer injuries were reasonably avoidable").

Likewise, in *F.T.C. v. Accusearch*, the FTC brought an enforcement action against a website that allowed purchasers to buy telephone records of third parties, without the consent or knowledge of those third parties. 570 F.3d 1187. In *Accusearch*, the people harmed were not customers of the company that engaged in an unfair trade practice; the harm the victims suffered was caused by the criminal actions of both third-party researchers who contracted with the company and the company's customers, who often illegally misused telephone data. *See F.T.C. v. Accusearch, Inc.*, No. 06-CV-105-D, 2007 WL 4356786 at *2 (D. Wyo. Sept. 28, 2007), *aff'd*, 570 F.3d 1187 (10th Cir. 2009); *Accusearch*, 570 F.3d at 1192, 1194. The District Court held that all

three unfairness elements were met, and the Tenth Circuit affirmed the trial court's holding that the conduct here fell within the ambit of the FTC Act's prohibition on unfair trade practices. *Accusearch*, 570 F.3d at 1193–94; *F.T.C. v. Accusearch, Inc.*, 2007 WL 4356786 at \*7-\*8. Both *Neovi* and *Accusearch* have strong parallels with this case: the harmed consumers had not purchased the companies' products but were instead innocent victims of the purchasers' foreseeable criminal misuse of those products.

### iii.  The FTC's enforcement actions support a broad reading of "consumer."

As further evidence that Daniel Defense's proffered definition of "consumer" is too narrow, the FTC has a long history of bringing enforcement actions for unfair acts that harm consumers other than a direct purchaser of a company's product or service. *See IFC Credit Corp.*, 543 F. Supp. 2d at 934 (noting that "[d]eference must be given to the interpretation of the agency charged by Congress with the statute's implementation," and agreeing with FTC that "consumer" in the FTC Act is broad enough to provide protection to small businesses and not-for-profit organizations). For instance, in a case involving malfunctioning agricultural equipment that caused serious injuries and deaths, the administrative law judge—in reasoning that was upheld by the Commission—focused on physical harm without regard to whether the person injured was the purchaser. *In the Matter of Int'l Harvester Co.*, 104 F.T.C. 949, 1984 WL 565290, at \*1-3 (1984). More recently, the FTC brought unfair practices enforcement actions against two sellers of "stalkerware," which is software that the purchaser installs on another person's mobile phone to monitor or surveil that person. Complaint, *In the Matter of Retina-x Studios, LLC*, No. 172-3118, 2019 WL 5587282 (F.T.C. Oct. 17, 2019); complaint, *In the Matter of Support King, LLC,* No. 192-3003, 2021 WL 4101690 (F.T.C. Aug. 26, 2021). The Commission alleged that the software "substantially injured device users by enabling purchasers to surreptitiously stalk them." *Retina-*

*x*, 2019 WL 5587282 at *3. In other words, the focus was not on harm to the purchaser, but on the foreseeable harm caused to third parties by the criminal actions of the purchaser.[12]

 As further evidence that the agency tasked with enforcing the FTC Act does not limit "consumer" to those who purchase a product, the FTC has brought unfair trade practices enforcement actions against companies whose advertisements encourage dangerous conduct by children, irrespective of whether the children (or their families) actually purchased the products. *See, e.g.*, *In the Matter of AMF, Inc.*, 95 F.T.C. 310, 1980 WL 338993 (1980) (advertisements which depicted children riding bikes dangerously); *In the Matter of Mego International*, 92 F.T.C. 186, 1978 WL 206501 (1978) (advertisements depicting a girl using an electric hair dryer near a full sink, without parental supervision, thereby "induc[ing] behavior which is harmful or involves an unreasonable risk of harm"); *In the Matter of Uncle Ben's, Inc.*, 89 F.T.C. 131, 1977 WL 188982 (1977) (advertisements showing children cooking food on a stove without supervision). In these cases the advertisement caused harm because it suggested dangerous misuse of a consumer product—just like Daniel Defense's advertisements did here. That this should give rise to liability under the FTC Act makes intuitive sense. Otherwise, a company would face no consequences for marketing, regardless of how explicitly the marketing encouraged the illegal misuse of their products in a manner that creates foreseeable and widespread harm.[13]

> ### iv. There is no requirement that the injured consumer have purchased Daniel Defense's products or transacted with the company.

---

[12]    Both of these cases were resolved via consent decrees. Support King, LLC; Analysis of Proposed Consent Order to Aid Public Comment, 86 Fed. Reg. 50357-02 (Sept. 8, 2021); Retina-X Studios, LLC; Analysis to Aid Public Comment, 84 Fed. Reg. 58386-01 (Oct. 31, 2019).

[13]    These enforcement actions also suggest that advertisements aimed at younger consumers that encourage dangerous behavior—such as Daniel Defense's marketing aimed at adolescent and young men—are particularly suspect.  See also Richard Starek III, "The ABCs at the FTC: Marketing and Advertising to Children" (July 25, 1997), available at: https://perma.cc/Z8YH-AHCB.

Daniel Defense argues that the fact that Plaintiffs were not "consumers of products Daniel Defense supposedly marketed unfairly" is fatal. Def. Br. at 21. It is not. Just like the injured consumers in *Neovi*, *Accusearch*, and other cases described above, Plaintiffs were injured by someone who purchased Daniel Defense's product and then used it unlawfully. Moreover, Plaintiffs have alleged a proximate connection between the unlawful marketing and the illegal misuse of the weapon. Thus, Daniel Defense's statement that "Plaintiffs were post-transaction victims of the Assailant's intentional, criminal acts," while true, does not carry any water. Def. Br. at 23. They are still consumers who were foreseeably injured by Daniel Defense's unfair practices.

In the same vein, Daniel Defense suggests with a sleight of hand that terms that are tied to a transaction ("customer" and "purchaser") are interchangeable with "consumers": "Plaintiffs are not 'consumers' because they had no role in the transaction. Plaintiffs did not bargain with Daniel Defense; they were not Daniel Defense's customer; and they did not purchase its products." Def. Br. at 23. Of course, the children and stalking victims that the FTC sought to protect in *AMF*, *Uncle Ben's*, *Retina-X Studios*, or *Accusearch* were neither customers nor purchasers.[14]

While it is true, as Daniel Defense next argues, that "whether the consumers had a free and informed choice" is sometimes considered by courts, Def. Br. at 23, that does not preclude a court from determining that harm to a third party (who is not a party to the transaction) satisfies the second prong. *See Neovi*, 604 F.3d at 1158 (noting that courts look to "whether consumers had a free and informed choice" before concluding that consumers (who had not engaged in transactions

---

[14] The dictionary definitions underscore that these terms are not interchangeable: Merriam-Webster defines "customer" as "one that purchases a commodity or service," a definition that is tied to a transaction. *Customer*, MERRIAM-WEBSTER COLLEGIATE DICTIONARY 286 (10th ed. 1994). Likewise, "purchaser" and "buyer" are terms tied to a transaction. This is in contrast with the term "consumer" ("one that utilizes economic goods")—a definition that is not tied to a specific transaction.

with the company accused of unfair trade practices) could not have reasonably avoided their injury). Here, Plaintiffs could not have made a free and informed choice that would have enabled them to avoid the harm caused by Daniel Defense's decision to market the illegal misuse of their products in a manner especially appealing to adolescent and young men, who (as the Complaint alleges), were highly susceptible to marketing that promoted illegal and violent endeavors. *See also* FTC Policy Statement on Unfairness, Letter from FTC to Senators Wendell H. Ford & John C. Danforth (Dec. 17, 1980) ("FTC Policy Statement on Unfairness"), https://perma.cc/7E34-Y8JP (noting that some marketing "hinders" free and informed decision making if it "exercise[s] undue influence over highly susceptible classes of purchasers.").[15]

Finally, Daniel Defense argues that "if 'consumer' status was afforded based on the consumption of ***any*** product or service, rather than consumption of" the unfairly marketed product, the result would be that "'consumer' in Section 45 simply means 'anybody.'" Def. Br. at 24 (emphasis in original). Not so. "Consumer" is a broad term, to be sure, but Section 45(n) limits its application: the statute excludes from consideration anyone not injured by the unfair trade practice. *See IFC Credit*, 543 F. Supp. 2d at 937. At a minimum, "consumer" includes direct purchasers as well as third parties directly and foreseeably injured by direct purchasers who use the product in a

---

[15]     The FTC Policy Statement on Unfairness was issued by the Commission in 1980, in response to an inquiry from the Consumer Subcommittee of the Senate Committee on Commerce, Science, and Transportation. It laid out the "Commission's views of the boundaries of its consumer unfairness jurisdiction," and first announced the "three tests" that were subsequently codified by Congress as 15 U.S.C. § 45(n). *See IFC Credit Corp*, 543 F. Supp. 2d at 946.

        Daniel Defense misleadingly quotes from the FTC Policy Statement on Unfairness to suggest that consumers must have been a party of the transaction, but the Policy Statement does not support that conclusion. Def. Br. at 22, 23 n.17. Rather, the Policy Statement indicates that "most cases" involve "monetary harm," and then gives examples that would qualify. Of course, Plaintiffs do not dispute that purchasers (like the Shooter) are consumers, but the statute, as written and applied by courts, extends to others harmed by seller conduct. There can be multiple consumers of the same product.

manner encouraged by the alleged unfair marketing (and who are themselves consumers in the broad sense of the word (see, e.g., Am. Compl. ¶¶ 98, 236, 237), even if not the direct purchasers of the particular product that was unfairly marketed).

### C. Plaintiffs have alleged facts sufficient to show that Daniel Defense engaged in unfair trade practices.

The Complaint alleges facts that satisfy each element of 15 U.S.C. § 45(n).

As to the <u>first</u> element ("causes or is likely to cause substantial injury to consumers"), the Complaint alleges that Daniel Defense's marketing and advertisements encourage the illegal and harmful misuse of their products, thus causing substantial injury to consumers. Def. Br. at 24-25; *see, e.g.*, *In re Beck's North America, Inc.*, 127 F.T.C. 379 (1999) (advertising depicting illegal and unsafe activities is an unfair activity). Daniel Defense does not contest this element.[16] The Complaint alleges that "Daniel Defense marketed its products by using militaristic imagery to suggest that civilian consumers could (and should) use their weapons the way service members are sometimes asked to: to engage in offensive combat missions directed at other humans." Am. Compl. ¶ 8. The company directed its marketing at the demographic group most susceptible to this message and most likely to misuse their weapons, adolescent and young men. *Id*. ¶¶ 8, 45. The Complaint contains numerous examples of Daniel Defense's marketing that encourages the illegal, offensive misuse of their products, examples of which are attached as Appendix A.

The company's marketing materials are directed at civilian young men. Am. Compl. ¶¶ 45, 54. For instance, much of Daniel Defense's marketing is through social media accounts, but the company has chosen not to institute age-gating on those accounts, instead taking deliberate steps to reach adolescent and young men, such as placing Daniel Defense rifles in Call of Duty franchise

---

[16] Daniel Defense does dispute that their marketing proximately caused the specific harm suffered by Plaintiffs, which is addressed in Section V, *infra*.

games and amplifying this product placement through social media and incorporating images from popular culture as well as celebrities. *Id*. ¶¶ 64-73. That a disturbed teenage boy would use a Daniel Defense AR-15 style rifle to engage in combat directed at non-combatants was a direct outcome of the company's marketing strategy. *Id*. ¶¶ 74-83, 91-92. The shooter had never fired a gun before, but as soon as he turned 18, he went to DanielDefense.com and purchased the AR-15 style rifle that he used to kill E.T. *Id.* ¶ 92. He made this decision, the Complaint alleges, because he had been exposed to Daniel Defense's marketing. *Id*.

With respect to the <u>second</u> element ("not reasonably avoidable by consumers themselves"), the Complaint alleges that E.T. and her family could not avoid this harm. *Id*. ¶ 98. Children in schools undergo active shooter trainings, but E.T. and her classmates were ten years old, and these trainings could not protect them. *Id*. E.T. and her family had neither the ability to "anticipate the impending harm and the means to avoid it." *Orkin Exterminating Co.*, 849 F.2d at 1365 (internal quotation marks omitted). And, where, as here, a company targets a "highly susceptible" class of purchasers, there is even less chance of avoiding injury. *IFC Credit*, 543 F. Supp. 2d at 946 (quoting FTC Policy Statement on Unfairness); Am. Compl. ¶ 91.

The Complaint also alleges facts sufficient to satisfy the <u>third</u> element (the injury is "not outweighed by countervailing benefits to consumers or competition"). There are, quite simply, no benefits to Daniel Defense's strategic decision to encourage the illegal misuse of their guns by marketing them to civilians using the kind of imagery and messaging described above, and it would not be burdensome for the company to revise its marketing strategy to focus, instead, on the lawful use of its products. *Id.* ¶ 99. The company knew the risks that adolescent and young men would misuse their products, as has occurred in numerous prior mass shootings where an AR-15 style rifle was used, but "chose to push the envelope in its marketing strategy to gain 'notoriety.'" *Id.*

¶¶ 69, 249. Daniel Defense's arguments as to the third prong are limited to baseless assertions about the benefits of their illegal marketing strategy—which are found nowhere in the Complaint, and thus not properly before the Court at this stage. Def. Br. at 27; *see Scanlan v. Texas A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).

### IV.   Plaintiffs Have Stated a Claim for Negligence Per Se Under Texas Law.

Daniel Defense separately moves to dismiss Plaintiffs' claim for negligence per se, arguing that it "fails as a matter of law." Def. Br. at 30. The company's arguments turn on the questions of whether the FTC Act can create a standard of conduct under Texas tort law, and whether the statute was intended to reach Daniel Defense's misconduct and Plaintiffs' injuries—both questions that should be answered in the affirmative.

To plead negligence per se, Plaintiffs alleged that Daniel Defense violated a standard of care set by the FTC Act. "Negligence per se is a tort concept whereby a legislatively imposed standard of conduct is adopted by the civil courts as defining the conduct of a reasonably prudent person." *Carter v. William Sommerville & Son, Inc.*, 584 S.W.2d 274, 278 (Tex. 1979) (citation omitted). In Texas negligence per se cases, two threshold issues predominate: (1) whether the statute was enacted "to protect the class of persons to which the injured party belongs," and (2) whether the statute was enacted to protect "against the hazard involved in the particular case." *Praesel v. Johnson*, 967 S.W.2d 391, 395 (Tex. 1998).

### A.   Plaintiffs are within the class of consumers protected by the FTC Act, and the FTC Act is designed to prevent the time of harm Plaintiffs suffered.

The FTC Act protects "consumers,"—a term of art that includes Plaintiffs—and is also designed to protect against the sort of harm that Plaintiffs' suffered by Daniel Defense's marketing encouraging a third-party criminal act. *See supra* Section III.B. And the FTC Act was intended to prevent a broad swath of injuries, including harm proximately caused by foreseeable third-party

criminal acts. *See id.* Thus, Plaintiffs are both within the class of persons protected by the FTC Act and their "injury is of a type that the statute was designed to prevent." *Perry v. S.N.*, 973 S.W.2d 301, 305 (Tex. 1998).

### B. Daniel Defense's attempt to add an extra element to negligence per se causes of action should be rejected.

Daniel Defense argues that Plaintiffs must specifically allege that courts have already found "a violation of the [particular] statute to be negligence per se." Def. Br. at 30. That is not Texas law and as a logical matter this could not be true—no court could ever hold that a new statute created a standard of conduct in a negligence per se action under this theory.

Daniel Defense first cites *Allison v. J.P. Morgan Chase Bank*, N.A., No. 1:11-CV-342, 2012 WL 4633177, at *14 (E.D. Tex. Oct. 2, 2012), where the plaintiff did "not factually allege the violation of a specific statute." The Court noted that plaintiff failed to "state how courts have determined that statute to establish negligence per se." *Id.* From this one line, Daniel Defense attempts to create a new pleading standard for negligence per se claims. But, read in context, it is apparent that the issue in that case was that the plaintiff had not alleged a statutory violation *at all*. Plaintiffs here have pled a violation of the FTC Act, Am. Compl. ¶ 245, so *Allison* is inapposite. The other cases relied upon by Daniel Defense to support this argument are similarly inapplicable. *Burgess v. Bank of Am., N.A.*, No. 5:14-CV-00495-DAE, 2014 WL 5461803, at *12 (W.D. Tex. Oct. 27, 2014) (stating that the "mere violation of that statute" is not negligence per se); *Bryant v. CIT Grp./Consumer Fin.*, No. CV H-16-1840, 2018 WL 1740075, at *7 (S.D. Tex. Apr. 11, 2018) (dismissing negligence per se claims where the plaintiff was not in the "class of individuals the statutes were intended to protect" and plaintiff's injury was not "the type that the statutes were designed to prevent"); *Menlo Inv. Grp., LLC v. Fought*, No. 3:12-CV-4182-K (BF), 2015 WL 547343, at *5 (N.D. Tex. Feb. 5, 2015) (dismissing a negligence per se case where the "Fifth

Amended Petition d[id] not allege the violation of any specific statute"). Together these cases stand for nothing more than the unremarkable proposition that a plaintiff must (1) plead the violation of a statute, and (2) meet other elements. Adding an element that a statute must have already been recognized by the courts in a negligence per se matter would make little sense, as it would stunt the development of the law.

### C. A violation of a civil law may form the basis of a negligence per se cause of action.

Daniel Defense next argues that the "Texas Supreme Court has repeatedly stated that negligence per se is based on the violation of a penal statute not a civil statute." Def. Br. at 32. Not so. While "[m]any of the statutes that [the Texas Supreme Court] has utilized to establish a standard of conduct for civil tort liability have been criminal laws," *Praesel*, 967 S.W.2d at 395, there are notable examples of Texas courts relying on non-penal statutes for the standard of care. *See, e.g.*, *Missouri Pac. R. Co. v. Am. Statesman*, 552 S.W.2d 99, 103 (Tex. 1977) (finding violation of civil statute may serve as the basis for negligence per se); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 549 (Tex. 1985) (violation of ordinance concerning security for vacant buildings could be negligence per se); *Osti v. Saylors*, 991 S.W.2d 322, 329 (Tex. App. 1999) (violation of the building code was negligence per se); *Carter*, 584 S.W.2d at 278 ("The easiest type of negligence per se case is that one involving a traffic regulation.").

To support its claim, Daniel Defense cites a general statement of law from *Reeder v. Daniel*, 61 S.W.3d 359, 361 (Tex. 2001): "Negligence per se is a common-law doctrine that allows courts to rely on a penal statute to define a reasonably prudent person's standard of care." Def. Br. at 32. But *Reeder* did not address the question of whether a civil statute could form the basis of a negligence per se claim. *Id*. And the fact that a criminal statute *may* define the negligence standard of care does not mean that *only* a criminal statute can do so.

Daniel Defense cites several Texas intermediate appellate court decisions and federal district court decisions that hold that only a penal law may serve as the statutory underpinning of a negligence per se claim. *E.g.*, *Watkins v. Cornell Companies, Inc.*, No. 3:11-CV-260-M-BN, 2013 WL 1914713, at *4 (N.D. Tex. Mar. 15, 2013), *report and recommendation adopted*, No. 3:11-CV-260-M-BN, 2013 WL 1926375 (N.D. Tex. May 8, 2013). But the Texas Supreme Court has not definitively resolved this question. "If the law of [Texas] is to be changed, '[i]t is up to the Supreme Court of [Texas] and not this court to change the substantive law of that state.'" *Jackson v. Johns-Manville Sales Corp.*, 781 F.2d 394, 397 (5th Cir. 1986) (en banc) (citation omitted) (overruled in part on other grounds). A federal court applying state law may not "alter existing law or [] change direction." *Id*. Here, in the absence of Texas Supreme Court or Fifth Circuit precedent expressly abrogating Texas Supreme Court's prior cases allowing negligence per se premised on non-penal statutes, this Court is not empowered to issue a ruling contrary to those cases.

### D. Using the FTC Act as a basis for a negligence per se action is not contrary to Congressional intent.

The FTC Act is a statute designed to protect consumers from unfair and deceptive trade practices; nothing in the Act suggests that it could not form the basis of a negligence per se action. Daniel Defense argues that because the FTC Act does not contain a private right of action, Congress did not intend for it to be relied on in a negligence per se claim. Def. Br. 38-40. This is flatly wrong. *Bryant*, 2018 WL 1740075, at *7 (noting "Bryant correctly notes that a negligence per se claim cannot be defeated solely because a statute does not provide a private right of action").

Daniel Defense conflates two distinct legal doctrines: (1) private rights of action, where the legislature expressly or implicitly creates an independent cause of action for a private plaintiff to enforce a statutory provision, and (2) negligence per se where the Court looks to a statute to set a standard of care in a common law negligence case. But under Daniel Defense's argument, a penal

32

statute—which it wrongly claims is the *only* type of statute that can be used in a negligence per se action—could not be used in a negligence per se action because penal statutes are only enforceable by the government. What is more, if a statute contains a private right of action, then there would be no need for a plaintiff to rely on the doctrine of negligence per se; they could just bring a cause of action under the statute. Rather, the question is whether there is some distinct reason that relying on a statute to establish the standard of conduct would thwart legislative intent. *Lively v. Carpet Servs.*, Inc., 904 S.W.2d 868, 873 (Tex. App. 1995), *writ denied* (Feb. 9, 1996) ("We follow a distinguished line of Texas precedents by specifically holding that a standard of conduct may be found in a statute silent on the issue of civil liability.").

Here, using the FTC Act as the standard of care in a negligence per se action does not thwart Congressional intent. "[T]he FTC Act . . . creates enforceable duties," *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.,* 440 F. Supp. 3d 447, 481 (D. Md. 2020), by "declar[ing] unlawful" "unfair or deceptive acts or practices." 15 U.S.C. § 45(a)(1). And for this reason, courts in other jurisdictions have rejected arguments similar to Daniel Defense's here and permitted negligence per se claims to go forward that are premised on violations of the FTC Act. *See, e.g., Perdue v. Hy-Vee, Inc.*, 455 F. Supp. 3d 749, 760-61 (C.D. Ill. 2020) ("Therefore, the FTC Act can serve as the basis of a negligence per se claim."); *In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1143 (C.D. Cal. 2021) (permitting negligence per se based on FTC Act because "reliance on the negligence per se doctrine does not fail merely because the statutes they allege Defendants violated do not provide a private right of action."); *In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 371 F. Supp. 3d 1150, 1176 (N.D. Ga. 2019) (same); *In re Marriott Int'l,*

33

*Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. at 482 (same); *Purvis v. Aveanna Healthcare, LLC*, 563 F. Supp. 3d 1360, 1377 (N.D. Ga. 2021) (same).[17]

In its argument, Daniel Defense cites a series of distinguishable cases involving statutes that create exclusive remedies. First, Daniel Defense points to *Smith v. Merritt*, 940 S.W.2d 602, 607-08 (Tex. 1997), a case about social host liability for serving alcohol to someone who then drives drunk. In that case, however, the plaintiffs attempted to bring a negligence per se claim based on a criminal statute when there was a parallel civil statute that provided an "exclusive cause of action for providing an alcoholic beverage to a person 18 years of age or older." *Id*. at 608 (citation omitted). Because the legislature had already considered and rejected the type of claim the plaintiffs sought to bring, the court declined to use the criminal statute to form the standard of care in a negligence per se claim. *Id*. Daniel Defense also cites *Reeder v. Daniel*, 61 S.W.3d 359, 362 (Tex. 2001), which is based on the same statutory scheme, and *Armstrong v. Sw. Airlines Co*., No. 3:20-CV-3610-BT, 2021 WL 4391247, at *4 (N.D. Tex. Sept. 24, 2021),  which involved a statute that created a limited mechanism for a private party to seek redress. *Smith*, *Reeder*, and *Armstrong* all reviewed statutes that had expressly created a limited remedial scheme for private parties. The FTC Act is not like these statutes in that it doesn't create an exclusive remedy for private parties. Thus, while it does not create a cause of action for a plaintiff that would necessarily confer federal jurisdiction, it is not improper to rely on it for a negligence per se claim. This court

---

[17] Additional unpublished cases permitting negligence per se claims based on FTC Act include: *In re Arby's Rest. Grp. Inc. Litig.*, No. 1:17-CV-0514-AT, 2018 WL 2128441, at *9 (N.D. Ga. Mar. 5, 2018); *In re: The Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 1:14-md-2583-TWT, 2016 WL 2897520, at *4 (N.D. Ga. May 18, 2016); *First Choice Fed. Credit Union v. Wendy's Co*., No. 16-506, 2017 WL 9487086, at *4 (W.D. Pa. Feb. 13, 2017), *report and recommendation adopted*, No. 16-506, 2017 WL 1190500 (W.D. Pa. Mar. 31, 2017); and *Baldwin v. Nat'l W. Life Ins. Co*., No. 2:21-CV-04066-WJE, 2021 WL 4206736, at *5 (W.D. Mo. Sept. 15, 2021).

should follow courts in other jurisdictions that have held the FTC Act is properly used in a negligence per se claim.

### E.  Plaintiffs' negligence per se claim is grounded in Texas common law.

Daniel Defense next argues that Plaintiffs' negligence per se claim fails because there is no "corresponding common law duty" to protect others from third-party criminal acts. Def. Br. at 40-41. This is an oversimplification of Texas law that elides an important exception to the general rule that there is no duty to control another person: namely that a defendant's "negligence is not superseded and will not be excused when the criminal conduct is a foreseeable result of such negligence." *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992) (citations omitted).

Under Texas tort law, there is no rule that a statute cannot provide a duty of care to victims harmed by third-party criminals. Thus, in *Nixon*, the Texas Supreme Court held that an ordinance regulating a building owner's obligations for securing vacant property could serve as the duty owed by that landlord in a negligence per se action, where a third-party criminal had raped a young child in a vacant apartment. 690 S.W.2d at 547, 549-51. The court held that the victim could bring suit under Texas law against the property owner, concluding that "the question of what duty [the property owner] owed to [the child] is answered by the ordinance." *Id*. at 549.

Similarly, in *Perry v. S.N.*, 973 S.W.2d 301, upon which Daniel Defense relies, the Texas Supreme Court discussed *Nixon* and observed that it has often—but not always—"deriv[ed] duty from the common law and look[ed] to the statute only for the standard of conduct." *Id*. at 306-07. *Perry* was a case about reporting child sexual abuse, and the court was not asked to create a "new common law duty to report it or take other protective action," and the court did not find an existing common-law duty corresponding to the statute. *Id*. at 306. *Holcombe v. United States*, also cited by Daniel Defense, is similarly a case about reporting duties. 388 F. Supp. 3d 777, 784-785 (W.D.

Tex. 2019). There, victims of the Southerland Springs mass shooting alleged that the Air Force failed to fulfill its reporting requirements under the Brady Act, which, had it done so, would have precluded the shooter from getting a weapon. *Id*. The Court held there was no analogous common law duty to report, and dismissed the negligence per se claim, but permitted a negligent undertaking claim to go forward, and that claim was ultimately successful at trial. *Id*. at 802-03.

Here, in contrast to both *Perry* and *Holcombe*, Plaintiffs have alleged that Daniel Defense *encouraged* criminal conduct, not that it merely failed to report it. "[D]uty is the function of several interrelated factors, the foremost and dominant consideration being foreseeability of the risk." *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987) (citations omitted), *superseded by statute* Tex. Alco. Bev. Code § 2.03 (1987). It is a well-known phenomenon, as alleged in the complaint, that mass shooters often use AR-15-style rifles, and that many mass shootings are committed by young, disaffected men. Am. Compl. ¶ 69. Thus, based on the foreseeability that militaristic AR-15 marketing targeted at young, disaffected men would encourage a mass shooter, a duty arises to not market these weapons in ways that encourage their suitability for illegal and offensive use.

## V. The Amended Complaint Alleges Facts Showing Daniel Defense's Conduct Proximately Caused Plaintiffs' Injuries.

Defendant argues that "Plaintiffs **do not plead any facts** that Daniel Defense's alleged unfair marketing practices were a proximate cause of Plaintiffs' injuries." Def. Br. at 28 (emphasis in original).[18] But the Complaint alleges facts more than sufficient to establish that the injuries suffered by Plaintiffs were the foreseeable result of Defendant's negligent and unlawful conduct, and the authorities cited by the Defendant do not support dismissal at this early stage.

---

[18]     In its brief, Daniel Defense addresses proximate cause separately for negligence and for negligence per se but concedes that the analysis is the same; Plaintiffs therefore address proximate causation for both causes of action together, in this section.

In Texas, "[b]reach of a duty proximately causes an injury if the breach is a cause in fact of the harm and the injury was foreseeable." *Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016). Cause in fact requires both that the negligent conduct "was a substantial factor in bringing about the harm at issue" and that the conduct was a "but for" factual cause. *Id*. Texas law recognizes that injuries may have "more than one proximate cause." *Id.*; *see also* Texas Pattern Jury Charges—General Negligence, Intentional Personal Torts & Workers' Compensation, at PJC 2.4 (2020 Ed.) (including in instruction for proximate cause that "[t]here may be more than one proximate cause of" an injury). Where, as here, a third party's actions were one factual cause, foreseeability determines whether the chain of causation remains intact. *Id*. at 98 ("If the intervening cause and its probable consequences are a *reasonably* foreseeable result of the defendant's negligence, the intervening cause 'is a concurring cause as opposed to a superseding or new and independent cause.'" *Id.* (citation omitted) (emphasis in original)); *see also Nixon*, 690 S.W.2d at 550 ("[T]he tortfeasor's negligence will not be excused where the criminal conduct is a foreseeable result of such negligence.").

Foreseeability "'does not require that a person anticipate the precise manner in which injury will occur once he has created a dangerous situation through his negligence.' It requires only that 'the general danger, not the exact sequence of events that produced the harm, be foreseeable.'" *Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 519 (Tex. 2019) (citations omitted). Texas courts have emphasized that "[f]oreseeability is a highly fact-specific inquiry that must be determined 'in the light of the attending circumstances,' not in the abstract." *Stanfield*, 494 S.W.3d at 98 (citation omitted). In other words: "proximate cause is ultimately a question for a fact-finder," and, at the pleading stage, a court "need only determine whether the petition 'creates a fact question' regarding the causal relationship between [the defendant's] conduct and the alleged

injuries." *Ryder Integrated Logistics, Inc. v. Fayette Cnty*., 453 S.W.3d 922, 929 (Tex. 2015) (citation omitted); *see also State of Texas v. Am. Tobacco Co*., 14 F. Supp. 2d 956, 967-68 (E.D. Tex. 1997) (denying motion to dismiss and rejecting arguments of tobacco companies and public relations firms that State's costs associated with providing medical care as the result of citizens' use of cigarettes and smokeless tobacco products were too remote to satisfy proximate cause).

The Complaint more than meets this requirement. It alleges that Daniel Defense's marketing (which was both negligent and violative of the FTC Act) encouraged consumers to illegally misuse its products and was directed precisely at the consumers most likely to do so— young, disaffected men like the shooter. The Complaint further alleges that this marketing inspired the shooter. More specifically, it alleges causation in fact, first by alleging that the negligent and unlawful conduct was a "substantial factor" (*Stanfield*, 494 S.W.3d at 97) in bringing about the harm to Plaintiffs:

- Daniel Defense "was not a household name" and the shooter "knew little about guns," but he steered "his web browser to DanielDefense.com and decided to purchase and then use one of their most lethal weapons, paying over $2,000 for a gun that he had neither held nor fired." Am. Compl. ¶ 92.

- "This was not chance or a coincidence; nor was it typical." The shooter was a "prolific user of social media," and "on information and belief, it was exposure to Daniel Defense's marketing . . . that influenced [the shooter] and led him to . . . purchase and then use one of their most lethal weapons." *Id*. ¶¶ 91-92.

- The gun that the shooter used to kill and injure students and teachers—the Daniel Defense DDM4 V7—was a semiautomatic rifle that enabled both "high rates of fire" and the use of ammunition that is large and travels faster, "translat[ing] to more lethal damage to the human body." *Id*. ¶ 95.

The Complaint also alleges facts showing that this was a "but for" cause of the harm suffered by Plaintiffs:

- The shooter was a disaffected adolescent male who "associated military service with killing people" and who had an "obsession with first-person shooter [video] games like *Call of Duty*." *Id*. ¶ 88.

38

- Despite this obsession, the shooter had never fired a gun in real life before the date of the Robb Elementary School shooting. *Id.* ¶ 92.

- But "Daniel Defense's unfair and illegal marketing tactics worked"—the shooter "had *virtually* fired rifles styled after those made by Daniel Defense many times in video games and in his imagination"—and caused the shooter to purchase the gun that he used to kill and injure dozens. *Id.* ¶¶ 8, 92.

- It was therefore "no accident" that the Daniel Defense DDM4 V7 was his weapon of choice in carrying out the massacre at Robb Elementary. *Id.* ¶¶ 2, 8.

- The shooter's "purchase and illegal use of the Daniel Defense DDM4 V7 was a direct result and foreseeable consequence of the way the company marketed its AR-15-style rifles." *Id.* ¶ 232.

And finally, the Complaint alleges facts showing that the shooter's actions were a foreseeable consequence of Daniel Defense's conduct:

- "Daniel Defense knew" that "AR-15-style rifles have been the weapon of choice for the young male shooters who disproportionately commit the most destructive mass shootings." *Id.* ¶ 75.

- "Daniel Defense knew that certain adolescents and young adult men are susceptible to advertising that plays on negative emotions and are particularly at risk of misusing AR-15 rifles, including the DDM4 V7." *Id.* ¶ 82.

- "In directing much of its advertising at young men and adolescents, Daniel Defense chose to target a group that was particularly susceptible to advertising and disproportionately likely to misuse Daniel Defense's products." *Id.* ¶ 78.

- "Daniel Defense's unfair and irresponsible marketing tactics put their assault rifle in [the shooter's] mind, delivered it into his hands, and influenced him to select it to carry out a horrific massacre, resulting in more carnage and worse suffering." *Id.* ¶ 97.

- This was a "foreseeable and entirely preventable chain of events set in motion by Daniel Defense." *Id.* ¶ 7.

Taken together, these allegations establish that Daniel Defense's marketing succeeded in getting its gun into the hands of someone who did not know the gun industry well and that Daniel Defense's marketing and sale of the DDM4 V7 were essential causes of the mass shooting that injured Plaintiffs. *See also Soto*, 331 Conn. at 98 (finding causation, at the pleadings stage, where plaintiffs had alleged that "the defendants' wrongful advertising magnified the lethality of the

Sandy Hook massacre by inspiring [shooter] or causing him to select a more efficiently deadly weapon for his attack"). None of this is intended to diminish the shooter's responsibility, but Texas law plainly contemplates that, in instances such as this, there can be multiple proximate causes. *Stanfield*, 494 S.W.3d at 97; *Nixon*, 690 S.W.2d at 550; Texas Pattern Jury Charges—General Negligence, Intentional Personal Torts & Workers' Compensation, at PJC 2.4 (2020 Ed.).

Daniel Defense argues that Plaintiffs do not allege that the shooter saw Daniel Defense's marketing and relied upon that marketing in carrying out the mass shooting at Robb Elementary. Def. Br. at 28. But this argument depends on the company's contention that pleading "upon information and belief" is effectively a concession that Plaintiffs "have no actual facts in this regard"—it is not. In the Fifth Circuit, "upon information and belief" pleading satisfies Rule 12(b)(6) where the facts are "in the control and possession of a defendant" or "'where the belief is based on factual information that makes the inference of culpability plausible.'" *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 730 (5th Cir. 2018) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)).

Here, the Complaint uses "upon information and belief" precisely as the Fifth Circuit has authorized: it charts a constellation of facts from which a plausible inference—indeed, the only logical inference—is that the shooter was exposed to Daniel Defense's marketing and that Daniel Defense's marketing caused the shooter to purchase and use its product to carry out a mass shooting. Among the facts that give rise to this inference: (1) that Daniel Defense "was not a household name," (2) that the shooter "knew little about guns and had never fired one previously," (3) that the shooter was "a prolific user of social media, including but not limited to Instagram," which Daniel Defense used for much its marketing described above, (4) that the shooter "associated military service with killing people," and Daniel Defense's marketing of its rifles to

40

civilians, as described above, placed a heavy emphasis on offensive military uses, (5) that the shooter went directly to the company's website, rather than a website that sold multiple brands of firearms, (6) that the shooter would have been familiar with Daniel Defense from the company's product placements in *Call of Duty* (a violent video game upon which shooter had a fixated), and (7) that he paid over $2,000 for a gun he had neither held nor fired. Am. Compl. ¶¶ 88, 91-92. These are detailed, factual allegations that, combined with certain reasonable inferences, "provide the plaintiff's grounds for entitlement to relief." *Cuvillier*, 503 F.3d at 401. Under Fifth Circuit precedent, that suffices at this early stage before Plaintiffs have taken discovery from Defendants and, where applicable, third parties.

None of the cases cited by Daniel Defense support its central argument that Plaintiffs' allegations are insufficiently pled. The cited authorities either are formulaic recitations of black letter law (*see, e.g.*, *Haqq v. Walmart Dep't Store*, No. EP-19-CV-00200-DCG, 2019 WL 4876958, at *2 (W.D. Tex. Oct. 3, 2019) (description of standard for reviewing motions to dismiss cases filed by *pro se* litigants)) or are plainly inapplicable. For example, *Ashe v. Corley* reviewed a district court decision on a motion for summary judgment, with a cross motion by plaintiffs to amend their complaint, not a motion to dismiss a complaint for failure to state a claim. 992 F.2d 540, 545 (5th Cir. 1993). *Cook v. City of Dallas* analyzed the standard whereby the City's use of property caused an injury—a requirement under the Texas Tort Claims Act that is not at issue here. No. 3:12-CV-3788-P, 2014 WL 10728794, at *4 (N.D. Tex. June 25, 2014). And in *Cook v. T-Mobile USA, Inc.*, the court found that the chain of causation was "too attenuated" but did not suggest that the allegations themselves were inadequately pled (at issue was whether the connection between the failure of a cell phone manufacturer to install certain GPS technology and

a 911 operator's alleged bias was too remote; unsurprisingly, the court found that it was). No. 3:14-CV-2907-P, 2015 WL 11120973 (N.D. Tex. June 2, 2015).[19]

## VI.    In the Alternative, Plaintiffs Seek Leave to Amend their Complaint.

"[D]ismissal under Rule 12(b)(6) generally is not immediately final or on the merits because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected." 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2002). The Fifth Circuit's "cases support the premise that '[g]ranting leave to amend is especially appropriate . . . when the trial court has dismissed the complaint for failure to state a claim.'" *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) (quoting *Griggs v. Hinds Junior College*, 563 F.2d 179, 180 (5th Cir.1977)). This is so, "even when the district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleading," with the result being that "leave to amend the complaint should be refused only if it appears to a certainty that the plaintiff cannot state a claim." Wright & Miller, *supra*, § 1357.

Should this Court dismiss any portion of the Complaint as inadequately pled, Plaintiffs request leave to amend, so that they may add additional factual allegations to bolster their complaint. In the weeks since Plaintiffs filed their amended complaint, they have continued their investigation into the shooting and Daniel Defense's role in it—as have journalists and regulators.

---

[19]     Defendant separately argues that Plaintiffs have not pled facts showing that the violation of the FTC Act proximately caused Plaintiffs' injuries. Def. Br. at 29. But there is no reason to believe that that question requires a different analysis than the general proximate causation analysis under Texas law. Because "the FTC Act expressly contemplates the possibility that conduct can be unfair before actual injury occurs," the question of causation under that statute turns on foreseeability. *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 246 (3d Cir. 2015). And, as in Texas, there is no requirement that a defendant's conduct be "the most proximate cause" of the injury (or likely injury). *Id.*

For instance, the Texas Tribune recently published an in-depth investigation into the how the shooter's use of the Daniel Defense AR-15-style rifle impacted the police response and may have caused law enforcement officers to delay their entering classrooms 111 and 112 to stop the shooter. Zach Despart, "*'He has a battle rifle'*: Police feared Uvalde gunman's AR-15," Texas Tribune, Mar. 20, 2023. Plaintiffs are also awaiting the release of the findings of the District Attorney's investigation of the shooting, as well as attempting to access additional evidence. Plaintiffs thus anticipate being in a position to include additional allegations about how the shooter's selection of Daniel Defense's rifle was a substantial factor in proximately causing their injuries.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask this court to deny Daniel Defense's motion to dismiss.

DATED: April 6, 2023

Respectfully Submitted,

*/s/ Molly Thomas-Jensen*

**EVERYTOWN LAW**
Eric Tirschwell (*pro hac vice*)
Molly Thomas-Jensen (*pro hac vice*)
Ryan Gerber (*pro hac vice*)
Laura Keeley (*pro hac vice*)
450 Lexington Avenue, P.O. Box #4184
New York, NY 10017
646-324-8226
etirschwell@everytown.org
mthomasjensen@everytown.org
rgerber@everytown.org
lkeeley@everytown.org

**LAW OFFICES OF BLAS DELGADO, P.C.**
Blas H. Delgado
2806 Fredericksburg Rd., Ste. 116
San Antonio, TX 78201
210-227-4186
delgadoblas@yahoo.com

**LM LAW GROUP, PLLC**
David Lopez (*pro hac vice*)
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX 78201
210-396-2045
Lopez.LMLawGroup@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of April 2023, I served the following counsel through

electronic service (ECF) as authorized by Fed. R. Civ. Pro. 5:

David M. Prichard
David R. Montpas
Prichard Young, LLP
Union Square, Suite 600
10101 Reunion Place
San Antonio, Texas 78216

Stephen B. Barron
Wright and Greenhill PC
4700 Mueller Blvd.
Suite 200
Austin, TX 78723

Thomas Phillip Brandt
Fanning Harper Martinson Brandt & Kutchin, P.C.
One Glen Lakes
8140 Walnut Hill Lane
Ste 200
Dallas, TX 75231

Blair J. Leake
Wright & Greenhill P.C.
4700 Mueller Blvd.
Suite 200
Austin, TX 78723

*/s/ Molly Thomas-Jensen*
Molly Thomas-Jensen

Appendix A

**Selection of Daniel Defense Advertisements from Plaintiffs' Amended Complaint**

Paragraph 53:



*Image from Daniel Defense 2022 print catalog (catalog is available for viewing on the website)*

Paragraph 54:



*Instagram (Mar. 2, 2022)*

Paragraph 55:



*Facebook (Mar. 13, 2021)*

Paragraph 56:



*Instagram (Oct. 11, 2021)*

Paragraph 57:



*Instagram (Sep. 27, 2021)*

Paragraph 58:



*Instagram (May 6, 2021)*



*Instagram (June 25, 2021)*

Paragraph 60:



*Still image from Daniel Defense promotional video. YouTube (Jan. 18, 2022)*

Paragraph 64:



*Facebook (Oct. 25, 2019)*



*Caption reads: "The circle is closing…," a reference to an obstacle called "Circle Collapse" that occurs in Call of Duty: Warzone. Instagram (June 7, 2021)*

Paragraph 66:



*Caption reads: "Verdansk never looked so good. Tag your Duos buddy below!" "Verdansk" is the name of a fictional city in the Call of Duty franchise. "Duos" is a term referring to a pair of people who play a video game together in a specific "duos" game mode. Instagram (May 26, 2021)*

Appendix B

# SUPERIOR COURT OF CALIFORNIA,
## COUNTY OF SAN DIEGO
## CENTRAL

## MINUTE ORDER

DATE: 07/02/2021                  TIME: 04:48:00 PM          DEPT: C-66

JUDICIAL OFFICER PRESIDING: Kenneth J Medel
CLERK:  Bernice Orihuela
REPORTER/ERM:
BAILIFF/COURT ATTENDANT:

CASE NO: **37-2020-00016638-CU-PO-CTL**  CASE INIT.DATE: 05/26/2020
CASE TITLE: **Goldstein vs Earnest [EFILE]**
CASE CATEGORY: Civil - Unlimited       CASE TYPE: PI/PD/WD - Other

---

### APPEARANCES

---

The Court, having taken the above-entitled matter under submission on 6/8/2021 and having fully considered the arguments of all parties, both written and oral, as well as the evidence presented, now rules as follows:

**Background:**
This case stems from a shooting at the Chabad of Poway synagogue on the last day of Passover in April, 2019. Using a firearm, the shooter shot and killed one person and injured others.
Plaintiffs allege that Smith & Wesson marketed, manufactured, distributed, and ultimately sold (through a retailer, San Diego Guns, LLC) a Rifle that was made to be easily modified into a military-style assault rifle prohibited under California law and which constituted an automatic-fire "machinegun" prohibited under federal law. The gun was marketed to a 19-year-old Shooter who did not have a valid hunting license that would have allowed him to buy the gun. See First Amended Complaint at ¶¶31–33.
As to San Diego Guns, plaintiffs allege San Diego Guns violated its duty as "a principal agent of federal law enforcement" in "restricting criminals' access to firearms. The First Amended Complaint specifically alleges that San Diego Guns violated this duty by (1) choosing to sell the weapon that was used to the Shooter, despite having actual or constructive knowledge that the hunting license the Shooter presented was not valid for the purchase of any firearms in April 2019, months before the license going into effect in July 2020. (Id. at ¶ 130-132); and (2) by transferring a firearm and ammunition to an individual under the age of 21 who had not presented and did not possess a valid hunting license, San Diego Guns knowingly and directly violated Cal. Pen. Code § 27510. (Id. at ¶ 124-125,137)
Also, San Diego Guns, as the seller and distributor engaged in sales of firearms in State of California, knew or should have known that Smith & Wesson included design features in its M&P 15 series of AR-15 style guns that enabled them to be easily modified, including to fire automatically and to constitute a prohibited assault weapon under California law. San Diego Guns, could have and should refused to distribute or sell weapons susceptible to such modifications (as other companies have chosen to do). (Id. at ¶ 52-53).
**Notice of Withdrawal of Certain Allegations**
On or about June 4, 2021, the Court received from Attorneys for Plaintiff a "Notice of Withdrawal of Certain Allegations from the First Amended Complaint." Attached to the Notice is a letter addressed to the Judge indicating that plaintiffs are no longer making allegations that the Rifle was modified in

---

CASE TITLE: Goldstein vs Earnest [EFILE]          CASE NO: 37-2020-00016638-CU-PO-CTL

violation of California's prohibition on assault weapons. Specifically, plaintiffs state the following allegation in the FAC are being withdrawn: p.9, paragraph 50, p. 10, paragraph 54, p.23, paragraph 106. Based upon this notice and statements made at oral argument, the Court STRIKES these allegations from the First Amended Complaint.

**Demurrers and Motions to Strike by LISA C. EARNEST and JOHN A. EARNEST and the State of California, Dept. of Fish and Wildlife**

**At the hearing, Lisa and John Earnest took their Demurrer and Motion to Strike OFF CALENDAR. Prior to the hearing, Plaintiffs dismissed the State of California, Dept. of Fish and Wildlife. The State of California, Dept. of Fish and Wildlife took their Demurrer and Motion to Strike OFF CALENDAR.**

**Demurrer by Smith & Wesson Brands, Inc. [S&W]**

The following causes of action have been alleged against S&W: (1) Products Liability – Defective Design; (2) UCL; (3) Common Law Negligence; (4) Public Nuisance

S&W first argues it is immune under the federal Protection of Lawful Commerce in Arms Act [PLCAA], which provides manufacturers and sellers with immunity against "civil action[s] ... for damages ... injunctive relief ... or other relief, resulting from the criminal or unlawful misuse" of firearms. 15 U.S.C. § 7903(5)(A).

Federal Preemption

Federal preemption is a question of Congressional intent. The PLCAA, both in its operative provisions and statements of purpose, clearly reveals congressional intent to prohibit state common law causes of action that meet the definition of a qualified civil liability action. Ileto v. Glock, Inc., 421 F. Supp. 2d 1274 (C.D. Cal. 2006) ("[C]ongressional intent to [preempt state tort claims] is clear from the text and purpose of the [PLCAA].")

Is this case a "qualified civil liability action"?

Under the PLCAA, a cause of action that meets the definition of a "qualified civil liability action" shall not be brought in any federal or state court. 15 U.S.C. § 7902(a).

Congress defined a "qualified civil liability action" as follows:

...a civil action...brought by any person against a manufacturer or seller of a qualified product...for damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, *resulting from the criminal or unlawful misuse of a qualified product by the person or a third party.* 15 U.S.C. § 7903(5)(A).

Plaintiffs argue this case does not fall within the scope of the general definition of "qualified civil liability action" within § 7903(5)(A), particularly when the section is read in conjunction with the preamble to the statute that indicates the Act's purpose is to prohibit actions for harm "solely caused" by the misuse or criminal use of guns. Plaintiffs argue that the First Amended Complaint alleges independent liability on behalf of the manufacturer and seller and thus, the action is not "resulting from" the [solely caused] criminal or unlawful use of the shooter.

First, as a matter of statutory construction, language stating the purpose for which a statute is enacted cannot be used to limit the clear terms used in the statute's operative provisions. H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 245. Here, the plain language of Section 7903(5)(A) requires the action to be "resulting from" the criminal or misuse. There is no requirement that it be "solely caused".

Based on the facts alleged in the FAC, the alleged liability here "results from" the criminal use.

The First Amended Complaint alleges the following:

1. On April 27, 2019, worshippers were gathered at the Chabad of Poway synagogue to attend services on the last day of the Jewish holiday, Passover, which commemorates the survival and liberation of the Jewish people.

2. Outside the synagogue was a teenager...who was bent on waging war on the worshippers and exterminating the Jewish people. His hateful views could not, on their own, cause a fraction of the

---

DATE: 07/02/2021                    MINUTE ORDER                    Page 2
DEPT: C-66                                                          Calendar No.

CASE TITLE: Goldstein vs Earnest [EFILE]                    CASE NO: **37-2020-00016638-CU-PO-CTL**

physical and emotional harm he would soon render on the Chabad community of worshippers.
3. As a result of Defendants' actions and/or inaction, the Shooter used a SMITH & WESSON M&P 15, AR-15 style rifle to engage in a mass shooting on April 27, 2019-a military-style assault on the worshippers at the Chabad of Poway synagogue (the "Incident").
There is no dispute that rifle used here is a "qualified product". Paragraph 3 alleges this action results from the misuse of that product. As alleged, this action is a "qualified civil action" within the purview of the PLCAA.

Exceptions

The immunity for firearm manufacturers and sellers is subject to certain exceptions set forth in 15 U.S.C. §§ 7903(5)(A)(i)-(vi). A viable state law action that fits within one of six enumerated exceptions is not prohibited. The following exceptions are relevant to this case.
...
(ii) an action brought against a seller for negligent entrustment or negligence per se;
(iii) an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought, including-
(I) any case in which the manufacturer or seller knowingly made any false entry in, or failed to make an appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted or conspired with any person in making any false entry or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a qualified product; or
(II) any case in which the manufacturer or seller aided, abetted, or conspired with any person to sell or otherwise dispose of a qualified product, knowing or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm under subsection (g) or (n) of section 922 of title 18;
...
(v) an action for death, physical injuries or property damage resulting directly from a defect in design or manufacture of the product, when used as intended or in a reasonably foreseeable manner, except that when the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage.
...
15 U.S.C. §§ 7903(5)(A)(i) - (vi).
"Predicate exception" [15 U.S.C. §§ 7903(5)(A)(iii)]
The "predicate exception" permits "[a]ctions where a manufacturer or seller knowingly violated a State or Federal Statute applicable to the sale or marketing of the product, *where violation proximately caused the harm sued upon*[.]" 15 U.S.C. § 7903(5)(A)(iii) [emphasis added].
After the "Notice of Withdrawal" (discussed above), the First Amended Complaint alleges that that Smith & Wesson knowingly violated, either directly or as an accomplice/conspirator: (1) the federal law's prohibition on the sale of automatic fire "machinegun[s]" to the general public (18 U.S.C. 922(b)(4)) and (2) California's prohibition on "deceptive, untrue or misleading advertising" under the Unlawful Competition Law.
(1) Federal Statute prohibiting sale of automatic fire machine guns.
Paragraph 56 of the First Amended Complaint alleges: "The NFA defines a "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). The definition also includes "the frame or receiver of any such weapon," as well as "any part" or "combination of parts designed and intended, for use in converting a weapon into a machinegun," and "any combination off parts from which a machinegun can be assembled" as long as those "parts are in the

---

DATE: 07/02/2021                              MINUTE ORDER                                    Page 3
DEPT: C-66                                                                          Calendar No.

possession of under the control of a person." Id.

Paragraph 57 alleges: "18 U.S.C. § 922(b)(4) prohibits the sale of "machinegun[s]" to members of the general public who have not undergone the required registration process."

Paragraph 58 alleges: "In 1982, the Bureau of Alcohol, Tobacco Firearms and Explosives (ATF) underscored that the NFA definition of "machinegun[s]" includes "those weapons which have not previously functioned as machineguns but possess design features which facilitate full automatic fire by simple modification or elimination of existing component parts."

Paragraph 64 alleges: "SMITH & WESSON chose to design the Rifle in a manner that made it able to be easily modified or degraded to fire automatically." Paragraph 65 alleges that methods for easy modification of the Rifle at issue.

Based on these paragraphs, plaintiffs have alleged a federal statute applicable to the sale or marketing of the product: 18 U.S.C. § 922(b)(4)).

S&M argues that "predicate exception" is still not applicable because in order to qualify for the "predicate exception", the violation must have "proximately caused the harm sued upon." 15 U.S.C. § 7903(5)(A)(iii). According to S&M, plaintiffs have not pleaded, nor do they now argue, that the rifle used in the shooting had actually been so modified to fire fully automatic as allegedly proscribed by the federal law. Thus, any violation of federal law did not "proximately cause" the harm sued upon.

Proximate cause is "that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produced the injury [or damage complained of] and without which such result would not have occurred..." (State of California v. Superior Court (1984) 150 Cal.App.3d 848, 857)

Paragraph 111 alleges: "Upon information and belief, the Shooter would not have acquired the Rifle or used it in the Incident but for his exposure to the reckless, deceptive and illegal marketing campaign disseminated by SMITH & WESSON and SMITH & WESSON's associated design decisions." Plaintiffs have alleged causation – the Shooter would not have acquired the Rifle or used it but for S&M's design decisions, which were allegedly in violation of federal law. Thus, for purposes of pleading, the First Amended Complaint alleges causation.

(2) California's prohibition on "deceptive, untrue or misleading advertising" under the Unlawful Competition Law

The question is whether the UCL is a "State or Federal statute applicable to the sale or marketing" of a firearm.

According to S&W, "Congress had in mind only ... statutes that regulate manufacturing, importing, selling, marketing, and using firearms or that regulate the firearms industry – rather than general tort theories that happened to have been codified by a given jurisdiction." Ileto v. Glock, Inc., 565 F.3d 1126, 1135-36 (2009), cert denied 560 U.S. 924 (2010).

Plaintiffs argue that because Congress chose not to limit the predicate exception to firearms-specific laws, but intended to exempt actions alleging a violation of any law that is capable of being applied to the sale and marketing of firearms, "then there is little doubt that state consumer protection statutes ...would qualify as predicate statutes." See Soto v. Bushmaster Firearms International, LLC, 331 Conn. 53, 119 (2019).

Accordingly, California's UCL-which forbids "unlawful, unfair or fraudulent" conduct with virtually any type of business activity-is clearly capable of being applied to the sale and marketing of firearms and qualifies as a "predicate." Cal. Bus. & Prof. Code §§ 17200 et seq.

There is a split of authority on the broad issue of whether consumer protection statutes such as California's UCL fall within statutes "applicable to the sale or marketing" of a firearm.

In statutory interpretation, the Court is to begin with plain language. See, e.g., Maslenjak v. United States, —— U.S. ——, 137 S.Ct. 1918, 1924, 198 L.Ed.2d 460 (2017). As stated by the Soto court, "applicable" means "capable of being applied." Under this understanding, the UCL is applicable to sale and marketing of a firearm. See Smith & Wesson Corp. v. Gary, 875 N.E.2d 422, 431, 434–35 and n.12 (Ind. App. 2007) (predicate exception unambiguously applies to any state law capable of being applied

CASE TITLE: Goldstein vs Earnest [EFILE]                CASE NO: **37-2020-00016638-CU-PO-CTL**

to sale or marketing of firearms), transfer denied, 915 N.E.2d 978 (Ind. 2009). The UCL would also, by its terms, be a statute involving sale or marketing of any product, including firearms.

Nothing in the statute indicates that that the predicate statutes have to exclusively apply to firearms. The Soto Court also insightfully found that "if Congress had intended to limit the scope of the predicate exception to violations of statutes that are directly, expressly, or exclusively applicable to firearms, however, it easily could have used such language, as it has on other occasions." Soto, supra, 331 Conn. at 119–20, 202 A.3d at 302–03.

The Court in Soto also recognized a significant point implying intent: at the time PLCAA was enacted, no federal statutes directly or specifically regulated the marketing or advertising of firearms. In addition, only a handful of states have enacted firearm specific laws that address in any way the marketing function, and none of those purports to comprehensively regulate the advertising of firearms. "It would have made little sense for the drafters of the legislation to carve out an exception for violations of laws applicable to the marketing of firearms if no such laws existed. Ibid. at 121-22.

Thus, the Court finds that the UCL qualifies as a "predicate statute." (Whether or not the First Amended Complaint meets the necessary elements for a UCL claim is discussed in depth below.)

Scope of the "Predicate Exception"

The question becomes what is the scope of the "predicate exception." Does the action as a whole, that is,"all" causes of action, survive if the "predicate exception" applies or should the court look at each cause of action on a claims-by-claim basis?

Plaintiffs argue that since this action fits into the "predicate exception" of the PLCAA for alleged violation of a statute relating to the sale of guns, their entire action survives.  They make the following statement in Opposition: "Courts across the country have held that PLCAA's "predicate exception" permits the entire "action in which" a predicate statutory violation is alleged to proceed, meaning that all claims survive-including simple negligence or nuisance claims which do not otherwise fall within an enumerated exception. Hence, Smith & Wesson is incorrect that Plaintiffs' negligence and public nuisance claims are automatically barred because there is no express exception for them under PLCAA, and that Plaintiffs' product liability claim is barred if it does not satisfy PLCAA's exception for products liability claims in § 7903(5)(A)(v)." (p.17)

There is a split of authority on this issue as summarized in the case of Ramos v. Wall-Mart Stores Unlimited 202 F.Supp.3d 457, 465-466 (Penn. 2016). (That decision is cited in the Reply Brief of San Diego Guns, LLC to its Demurrer. The issue was left unresolved in the decision, but the cases supporting the split are acknowledged.)

This Court interprets the PLCAA to apply on a claim-by-claim basis, requiring every claim within a case to find its own exception to avoid being blocked by the Act. The express purpose of the Act was to "prohibit *causes of action* against manufacturers, distributors, dealers, and importers of firearms or ammunition products...for the harm solely caused by the criminal or unlawful misuse of firearm products," see 15 U.S.C. § 7901(b)(1) (emphasis added). Further, the Act's exceptions appear to pertain to individual claims, including negligent entrustment or negligence per se as well as products liability.

**Constitutionality**

Plaintiffs raise a variety of challenges to the constitutionality of the PLCAA, including that the PLCAA exceeds Congress' commerce clause authority, violates the Tenth Amendment, and deprives them of the due process clause and equal protection rights.

At this juncture, the Court does not need to reach these constitutionality issues in ruling on the demurrer given the analysis above that the statute is not a bar to all allegations in the case. In other words, the constitutionality would only be an issue if the Court were to determine that there was no liability under the statute. These issues are preserved for any future dispositive rulings.

First Cause of Action for Products Liability

SUSTAINED WITHOUT LEAVE TO AMEND

The basis for this cause of action is the following alleged design defect: "The Rifle was designed to be

CASE TITLE: Goldstein vs Earnest [EFILE]                    CASE NO: **37-2020-00016638-CU-PO-CTL**

easily modified to fire automatically, prohibited under federal law unless sold in compliance with the federal National Firearms Act ("NFA")."

In the demurrer, defendants contend that this cause of action is squarely covered by the PLCAA. Products liability for defects in design or manufacture are exempt under subdivision 7903(5)(A)(v), "*except* that when the discharge of the product was caused by a volitional act that constituted a criminal offense, then such act shall be considered the sole proximate cause of any resulting death, personal injuries or property damage."

According to defendant, plaintiffs have pleaded that the shooter deliberately discharged the firearm. (FAC ¶¶ 160-165). The shooter's volitional act was undeniably criminal, and was as a matter of law, the sole proximate cause of the shooting and plaintiff's damages under § 7903(5)(A)(v).

As discussed above, Plaintiffs argue that since this matter fits into the "predicate exception" of the PLCAA for alleged violation of a statute relating to the sale of guns, their entire action survives, including products liability. However, the statute specifically addresses products liability claims. Thus, even if there is a predicate statutory basis for other causes of action, products liability is allowed *except when the discharge of the product was caused by a volitional act that constituted a criminal offense.* As indicated above, the pleading indicates the discharge of the product was caused by a volitional act that constituted a criminal offense. Thus, the products liability claim is barred under the PLCAA.

<u>Second Cause of Action for UCL Violation</u>
SUSTAINED WITH 20 DAYS LEAVE TO AMEND
As stated above, this Court finds that California's UCL qualifies as a statute applicable to the sale or marketing of firearms under the predicate exception to PLCAA immunity. 15 U.S.C. § 7903(5)(A)(iii). Defendant S&W make additional arguments as to the viability of this claim.
(1) No deceptive marketing claim under the UCL fraudulent prong.
The FAC alleges that SMITH & WESSON engaged in a marketing campaign targeting youth with advertisements over social media and through videogame-like commercials despite the known risks that young people in that demographic are highly susceptible to that type of advertising and have disproportionately perpetrated mass shootings using similar firearms. SMITH & WESSON's marketing violated California's prohibition on "deceptive, untrue or misleading advertising" (see Cal. Bus. & Prof. Code § 17200)
S&W argues that, as a matter of fact, the Court will not be able to make findings that support deceptive, untrue or misleading advertising. However, the Court cannot make this determination on demurrer.
(2) Standing
Under cases such as Kwikset Corp. v. Superior Court, 51 Cal.4th 310, 322 (2011) ("[A] party must ... (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e. economic injury, and (2) show that the economic injury was the result of, i.e., caused by the unfair business practice ... that is the gravamen of the claim." The Court in Kwikset summarized the types of injuries in which economic injury from unfair competition may be shown. A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary. Ibid. citing Hall v. Time Inc., supra, 158 Cal.App.4th at pp. 854–855.
The pleading does not allege any injury in fact under any of the categories defined above. Leave to amend is granted in order for plaintiffs to allege an "injury in fact."

<u>Third Cause of Action for Ordinary Negligence and Sixth Cause of Action for Public Nuisance</u>
OVERRULED
Plaintiffs allege that S&W was negligent in designing the firearm, advertising the firearm, and failing to monitor and supervise the downstream retail sale of the firearm by San Diego Guns. (FAC ¶ 197). Plaintiffs also allege that S&W's design of the firearm, its advertisements for the firearm, and its failure to

---

CASE TITLE: Goldstein vs Earnest [EFILE]                    CASE NO: **37-2020-00016638-CU-PO-CTL**

monitor and supervise the downstream retail sale of the firearm by San Diego Guns was a public nuisance under California Civil Code § 3480. (FAC ¶¶ 228-242).

S&W argues General Negligence and Public Nuisance are not enumerated as exceptions under the PLCAA. The PLCAA preempts common law claims like general negligence and public nuisance. Congress did not provide an enumerated exception for general negligence or public nuisance. "Congress consciously considered how to treat tort claims" and it "chose generally to preempt all common law claims" except negligent entrustment and negligence per se. (Illeto v. Glock 565 F.3d 1126, 1135 n.6 (9th Cir. 2009)).

Plaintiffs argue this claim would survive under the "predicate exception." Paragraph 197 generally alleges that S&W "design[ed] a firearm that could be easily modified, including to become an assault weapon prohibited under California law, and·to fire automatically, effectively prohibited to sell to·the general public under federal law (unless the NFA's requirements were followed).

As pled, these causes of action are based upon an alleged violation of a federal statute and would thus fall within the predicate exception. It is an "action" where a manufacturer or seller [allegedly] knowingly violated a State or Federal Statute applicable to the sale or marketing of the product."

First Amendment Argument

The Second Cause of Action for Negligence, the Third Cause of Action for UCL and the Sixth Cause of Action for Public Nuisance are based, in part, on S&W's advertisements. S&W argue alternatively that Plaintiffs' claims that S&W advertisements caused the shooter to commit his crimes should be dismissed because the claims violate the First Amendment of the United States Constitution.

Commercial speech that proposes an illegal transaction or that promotes or encourages an unlawful activity does not enjoy the protection of the First Amendment. See, e.g., Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 496, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations, 413 U.S. 376, 388–89, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973); see also Thompson v. Western States Medical Center, 535 U.S. 357, 367, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002); Lamar Outdoor Advertising, Inc. v. Mississippi State Tax Commission, 701 F.2d 314, 321–22 (5th Cir. 1983). Plaintiffs' First Amended Complaint alleges that the marketing in question promoted unlawful activity.

Duty to monitor, supervise or control conduct of San Diego Guns

S&W also argue that the Complaint also alleges that S&W is responsible for San Diego Guns' alleged conduct based on a claimed common law duty on the part of S&W to "monitor sales by downstream ... sellers." (FAC ¶¶ 154-157). Plaintiffs assert that S&W's alleged failure to supervise San Diego Guns' sale of the firearm was negligent (Third Cause of Action) and a public nuisance (Sixth Cause of Action).

According to S&W, there is no principal-agent relationship between S&W and San Diego Guns that would lead to vicarious liability.

This argument does not dispose of the negligence cause of action and is thus inappropriate for demurrer.

**Motion to Strike by S&W**

The Motion to Strike is DENIED.

Punitive damages are properly pled by identifying a cause of action for which punitive damages are recoverable and describing the acts or omissions that constitute fraud, oppression or malice as those terms are defined in California Civil Code section 3294(c). "Malice" is defined as either: (1) conduct which is intended by the defendant to cause injury to the plaintiff, or (2) "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1).) "Oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (Civ. Code, § 3294, subd. (c)(2).) And "fraud" is "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or

legal rights or otherwise causing injury." (Civ. Code, § 3294, subd. (c)(3).)

A claim for punitive damages is a serious accusation of wrongful conduct, which requires proof by "clear and convincing evidence" that a defendant has been guilty of oppression, fraud, or malice to justify a claim for punitive damages. (Mock v. Michigan Millers Mut. Ins. Co. (1992) 4 Cal.App.4th 306, 327-28; Tomaselli v. Transamerica Ins. Co. (1994) 25 Cal.App.4th 1269, 1287.) "Clear and convincing" means evidence "so clear as to leave no substantial doubt . . . [i]t must be sufficiently strong to command the unhesitating assent of every reasonable mind." (In re David C.

To support a punitive damages claim, "ultimate facts" of the defendant's oppression, fraud, or malice must be pled. (Cyrus v. Haveson (1976) 65 Cal.App.3d 306, 316-317.) Sparse claims of malice, oppression or fraud, absent specific factual allegations, are nothing more than insufficient, "patently conclusory language." (Brousseau v. Jarret (1977) 73 Cal.App.3d 864, 872.) Simply inserting buzzwords like "oppression," "fraud," or "malice," without factual support, does not create a legitimate punitive damages claim. (See id.; Grieves v. Sup. Ct. (1984) 157 Cal.App.3d 159, 166); Spinks v. Equity Res. Briarwood Apts. (2009) 171 Cal.App.4th 1004, 1055.)

As to S&W, plaintiffs specifically allege that in 2000, Smith & Wesson entered into a settlement with the federal government and several cities, and vowed to reform its business practices to prevent criminal misuse of its guns, including agreeing to not "sell . . . a weapon designed in a manner so that with a few additional parts and/or minimal modifications an owner can convert the firearms into an illegal fully automatic weapon. Complaint ¶62. Twenty years later, Smith & Wesson has continued selling firearms that it knew could be easily modified to turn into fully automatic assault weapons – even when its modified guns have been used in other mass shootings. It also fraudulently and deceptively marketed its Rifle with known intent to put them in the hands of persons in a demographic particularly likely to cause extreme harm--and indeed, harm that is the epitome of "cruel and unjust hardship in conscious disregard" of the rights and safety of others.

S&W relies on Civil Code section 3294(b) for the proposition that when suing a corporation, plaintiffs are required to plead authorization by an S&W officer, director or managing agent in order to state a claim for punitive damages against a corporation like S&W. However, this argument misapplies Section 3294(b). That section applies when a plaintiff is suing a corporate employer for the actions of a corporate employee. The section provides in full:

An employer shall not be liable for (exemplary damages) based upon the acts of the employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct...or was personally guilty of oppression, fraud or malice.

With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation.

In this case, the alleged allegations are the policies of the corporation itself and not a specific employee of the corporation.  Civil Code 3294(b) simply does not apply.

## Demurrer by San Diego Guns

The following causes of action are alleged against SD Guns: (1) Products Liability – Defective Design; (2) Common Law Negligence; (3) Negligence Per Se; (4) Negligent Entrustment (NOT challenged by demurrer); (5) Public Nuisance

### Whether this is a "qualified civil action"

See discussion above with respect to S&W's Demurrer. A "qualified civil liability action" is defined, in relevant part, as seeking redress for harm "resulting from the criminal or unlawful misuse of a qualified product by the person or a third party." As stated with respect to the analysis of S&W's demurrer, the action does not need to be "solely caused" by the criminal actions.

### "Predicate Exception"

See discussion above with respect to S&W's Demurrer.

CASE TITLE: Goldstein vs Earnest [EFILE]          CASE NO: **37-2020-00016638-CU-PO-CTL**

First Cause of Action for Product Liability
SUSTAINED WITHOUT LEAVE TO AMEND
See discussion above with respect to S&W's Demurrer.
Fourth Cause of Action for Negligence Per Se
OVERRULED.
As Defendant concedes in its moving papers, "negligence per se" is already enumerated as an exception to immunity from causes of action against sellers of firearms under PLCAA. Demurrer 9:12-13. Defendant however argues negligence per se is not a separate cause of action in California, so Plaintiffs cannot use this doctrine to prove San Diego Guns' negligence in this case.
However, the cause of action for negligence per se presumes negligence upon a violation of statute. Negligence per se creates an evidentiary presumption that affects the standard of care in a cause of action for negligence. Millard v. Biosources, Inc., 156 Cal. App. 4th 1338, 1353 (2007).
As alleged in the complaint, San Diego Guns violated laws applicable to the sale or marketing of firearms including but not limited to Cal. Pen. Code § 27510 by selling the Rifle to the Shooter with actual and/or constructive knowledge that the Shooter was under the age of 21 and lacked a valid hunting license. FAC ¶¶212-213. The complaint further alleges that Cal. Pen. Code § 27510 and other potentially applicable state and/or federal firearms laws are designed to protect all members of the general public from the foreseeable harm that results when dangerous possessors like the Shooter gain access to lethal weapons, and as such Plaintiffs were within the class of people Cal. Pen. Code § 27510 and/or other potentially applicable state and/or federal firearms laws are designed to protect. FAC ¶¶ 214-215. And finally, as a direct and foreseeable result of San Diego Guns' actions, Plaintiffs Goldstein and N.D. were seriously injured, and all Plaintiffs have suffered, and continue to suffer, great pain of mind and body, shock, and further severe and persistent emotional distress, physical manifestations of emotional distress, loss of enjoyment of life, loss of earnings and earning capacity, and incurred substantial expenses for medical and psychological treatment, therapy and counseling and other economic and/or noneconomic damages. FAC ¶¶ 217-218.
Third Cause of Action for Negligence; Sixth Cause of Action for Public Nuisance
OVERRULED.
See analysis with respect to S&W's Demurrer.
**San Diego Guns' Motion to Strike**
DENIED
In their Prayer for Relief, Plaintiffs generally claim entitlement to punitive damages against all defendants. (FAC, p. 51:1.)
Punitive damages are properly pled by identifying a cause of action for which punitive damages are recoverable and describing the acts or omissions that constitute fraud, oppression or malice as those terms are defined in California Civil Code section 3294(c). "Malice" is defined as either: (1) conduct which is intended by the defendant to cause injury to the plaintiff, or (2) "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1).) "Oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (Civ. Code, § 3294, subd. (c)(2).) And "fraud" is "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (Civ. Code, § 3294, subd. (c)(3).)
A claim for punitive damages is a serious accusation of wrongful conduct, which requires proof by "clear and convincing evidence" that a defendant has been guilty of oppression, fraud, or malice to justify a claim for punitive damages. (Mock v. Michigan Millers Mut. Ins. Co. (1992) 4 Cal.App.4th 306, 327-28; Tomaselli v. Transamerica Ins. Co. (1994) 25 Cal.App.4th 1269, 1287.) "Clear and convincing" means evidence "so clear as to leave no substantial doubt . . . [i]t must be sufficiently strong to command the unhesitating assent of every reasonable mind." (In re David C.

CASE TITLE: Goldstein vs Earnest [EFILE]                    CASE NO: **37-2020-00016638-CU-PO-CTL**

To support a punitive damages claim, "ultimate facts" of the defendant's oppression, fraud, or malice must be pled. (Cyrus v. Haveson (1976) 65 Cal.App.3d 306, 316-317.) Sparse claims of malice, oppression or fraud, absent specific factual allegations, are nothing more than insufficient, "patently conclusory language." (Brouseau v. Jarret (1977) 73 Cal.App.3d 864, 872.) Simply inserting buzzwords like "oppression," "fraud," or "malice," without factual support, does not create a legitimate punitive damages claim. (See id.; Grieves v. Sup. Ct. (1984) 157 Cal.App.3d 159, 166); Spinks v. Equity Res. Briarwood Apts. (2009) 171 Cal.App.4th 1004, 1055.)

As to San Diego Guns, plaintiffs allege it chose to violate Cal. Pen. Code § 27510 by selling the Rifle, a weapon that could have been easily modified to become an assault weapon, and multiple rounds of ammunition to the Shooter. They made the sale despite knowing that the Shooter was under the age of 21 and with the knowledge that the hunting license the Shooter presented was not valid for the purchase of any firearms in April 2019, months before the license going into effect in July 2020. (Id. at ¶ 124-137).

Attorney Fees (SD Guns)

DENIED.

SD Guns seeks to strike the request for attorney fees.

There is at least a potential for attorney fees under the "private attorney general doctrine" under CCP 1021.5, which provides, in part: "[u]pon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if:

(a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons.

Injunctive Relief

DENIED.

Injunctive relief is a remedy for the nuisance cause of action.

IT IS SO ORDERED.

*Kenneth J. Medel*

_____

Judge Kenneth J Medel

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

Central
330 West Broadway
San Diego, CA 92101

| | |
|---|---|
| **SHORT TITLE:** Goldstein vs Earnest [EFILE] | |

| **CLERK'S CERTIFICATE OF SERVICE BY MAIL** | **CASE NUMBER:** <br> **37-2020-00016638-CU-PO-CTL** |
|---|---|

I certify that I am not a party to this cause. I certify that a true copy of the attached minute order was mailed following standard court practices in a sealed envelope with postage fully prepaid, addressed as indicated below. The mailing and this certification occurred at San Diego, California, on 07/02/2021.

Clerk of the Court, by: _B. Onhuela_ , Deputy

SEAN R FERRON
LAW OFFICES OF ADRIENNE D COHEN
1551 NORTH TUSTIN AVENUE # 750
SANTA ANA, CA 92705

BETSEY BOUTELLE
880 FRONT STREET # 6293
SAN DIEGO, CA 92101

MARC P MILES
SHOOK HARDY & BACON LLP
5 PARK PLAZA # 1600
IRVINE, CA 92614

P J LUCCA
DEPUTY ATTORNEY GENERAL
600 W BROADWAY # SUITE 1800
SAN DIEGO, CA 92101

NEIL G GILMOR
3636 FOURTH AVENUE # 200
SAN DIEGO, CA 92103

COREY C GARRARD
WINGERT GREBING BRUBAKER & JUSKIE LLP
600 WEST BROADWAY, SUITE 1200
SAN DIEGO, CA 92101

DANIEL R SHINOFF
ARTIANO SHINOFF
3636 FOURTH AVENUE # 200
SAN DIEGO, CA 92103

MAURICE A BUMBU
3636 FOURTH AVENUE # 200
SAN DIEGO, CA 92103

ANNE E WADDELL
ONE MARKET PLAZA, SPEAR TOWER, 24TH FLOOR
SAN FRANCISCO, CA 94105

☐ Additional names and address attached.

**CLERK'S CERTIFICATE OF SERVICE BY MAIL**