FILED
SEP 2 9 2026
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY ______ DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**DEL RIO DIVISION**

| | | |
|---|---|---|
| **SANDRA C. TORRES et al., Plaintiffs,** | § § | |
| **v.** | § § | **CIV. NO. DR-22-CV-59-AM** |
| **DANIEL DEFENSE, LLC et al., Defendants.** | § § § | |

**ORDER**

On May 24, 2022, a lone teenage gunman opened fire at Robb Elementary School in Uvalde, Texas. Three minutes after arriving at the school, he entered two connected classrooms, and over a timespan of seventy-four minutes, he murdered nineteen students and two teachers. State, city, county, and school district law enforcement officers responded to the scene within minutes, but no one entered the two classrooms for the full seventy-four minutes that followed. The massacre ended only when federal officers finally breached one of the classroom doors and killed the shooter within seconds.

E.T. was one of the innocent victims murdered that tragic day. After the death of their beloved daughter and sister, the Plaintiffs, who are family members of E.T., filed the present suit, bringing state and federal causes of action against the responding law enforcement officers, various municipalities, the gun manufacturer and seller of the gun used during the shooting, and the store where the shooter picked up the gun and purchased additional ammunition.

Now pending before the Court are the following motions to dismiss:

(1) Motions to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure by: (a) Defendant Pedro Arredondo [ECF No. 57]; (b) Defendants Justin Mendoza, Max Dorflinger, Daniel Coronado, and Mariano Pargas [ECF No. 66]; (c)

Defendants City of Uvalde and Mariano Pargas, in His Official Capacity [ECF No. 88]; (d) Defendant Jesus Suarez [ECF No. 90]; and (e) Defendant Uvalde Consolidated Independent School District ("UCISD") [ECF No. 105];

(2) A motion to dismiss under Rules 12(b)(1), 12(b)(6), and 12(b)(7) of the Federal Rules of Civil Procedure by Defendants Joel Betancourt, Juan Maldonado, and Christopher Kindell [ECF No. 81];

(3) Motions to Dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure by: (a) Defendant Uvalde County [ECF No. 58]; and (b) Defendants Ruben Nolasco, Emmanuel Zamora, and Johnny Field [ECF No. 59]; and

(4) Motions to Dismiss under Rule 12(b)(6) by Defendant Oasis Outback, LLC ("Oasis Outback") [ECF No. 77] and Defendant Daniel Defense, LLC ("Daniel Defense") [ECF No. 140], which will be addressed in a separate order.

Also pending before the Court are motions to withdraw as attorney [ECF Nos. 129, 144], a motion for status conference [ECF No. 130], and a motion to amend complaint [ECF No. 146].

On April 17, 2025, the Plaintiffs filed a Notice of Dismissal, without prejudice, of any claims against Defendants City of Uvalde, Mariano Pargas, Jesus "J.J." Suarez, Daniel Coronado, Justin Mendoza, and Max Dorflinger [ECF No. 160], thus mooting their motions to dismiss [ECF Nos. 66, 88, 90]. On August 14, 2025, the Plaintiffs filed a Notice of Dismissal, without prejudice, of the claims against Defendants Uvalde County, Ruben Nolasco, Emmanuel Zamora, and Johnny Field [ECF No. 165], thus mooting their motions to dismiss [ECF Nos. 58, 59]. Then, on September 22, 2025, the Plaintiffs filed Notices of Dismissal, *with prejudice*, of the same claims against the same defendants. (ECF Nos. 168, 169.)

After carefully considering the remaining motions to dismiss pertinent to this Order [ECF Nos. 57, 81, 105], the Court concludes that Defendants UCISD, Arredondo, Betancourt, Maldonado, and Kindell, as well as John Does 1-119, are entitled to dismissal of the claims against them, as explained below. Although E.T. was robbed of her future and life, the Court is constrained by Fifth Circuit case law and must grant the motions to dismiss.

## I. ALLEGED FACTS

Within days of turning eighteen years old, Salvador Ramos, a troubled teenager, spent thousands of dollars online on 1,740 rounds of ammunition and an AR-15 rifle manufactured and sold by Daniel Defense. On May 20, 2022, four days later, Ramos picked up the Daniel Defense rifle at Oasis Outback, a sporting goods store in Uvalde, Texas. This was his third visit to Oasis Outback in a four-day period, previously purchasing another assault rifle and 375 rounds of AR-15 ammunition. On the day he picked up the Daniel Defense rifle, patrons noted that Ramos, dressed all in black, had a nervous disposition and was behaving suspiciously. One patron presciently described Ramos as someone who looked like a school shooter.

On the morning of May 24, 2022, Ramos shot and injured his grandmother at her house in Uvalde, Texas. Carrying two assault rifles and hundreds of rounds of ammunition, he then drove his grandmother's vehicle towards Robb Elementary School, a short distance away, where he lost control of the vehicle and crashed into a ditch. As concerned onlookers approached the vehicle, he opened fire upon them, prompting them to run away and call 911. At 11:29 a.m., he crawled out of the passenger side of the wrecked vehicle, grabbed a backpack, scaled a five-foot fence, and walked through the teachers' parking lot of the school.

Ramos spotted a school instructor with her third-grade students and began to shoot. The instructor escorted her children to safety and used her radio to warn others to initiate lockdown

procedures. The principal of the school heard the radio report and attempted to initiate a lockdown via the school's text message alert system but was unable to do so because of a poor Wi-Fi signal. The principal then called Defendant Pete Arredondo, the chief of police of the UCISD Police Department ("PD"), who instructed her to shut the school down.

Slowly, classrooms began to lock down as word spread of the shooting. Ramos, however, proceeded through an unlocked door on the west side of the school. At 11:33 a.m., Ramos entered an unlocked classroom that was connected to another classroom and began firing at teachers and fourth-grade children. Initial law enforcement responders arrived at the scene within three minutes, but seventy-four additional minutes passed before anyone breached the classrooms and killed Ramos. During those seventy-seven minutes, Ramos murdered nineteen children and two teachers and injured at least seventeen others.

Arredondo was one of the initial responders. Consistent with nationally recognized active shooter policies, UCISD's policy required Arredondo, as the chief of police of the school district, to set up a command post and serve as the on-site commander. The policy also instructed officers to immediately neutralize the shooter and provide aid to victims, irrespective of the risk to law enforcement. However, neither Arredondo nor anyone else did any of the above. Arredondo instead communicated to others that the shooter was "barricaded," which in law enforcement jargon indicates a non-active shooter. He also repeatedly instructed officers to hold off entering the classrooms and called for additional support and fire power.

Meanwhile, *hundreds* of additional law enforcement officers from numerous state and federal agencies gathered around the school. Among these officers were: (1) Defendant Mariano Pargas, the acting chief of the Uvalde Police Department, who was one of the initial responders; (2) Defendant Ruben Nolasco, the Uvalde County Sheriff, who delayed in relaying critical

information about the identity of the shooter; (3) Defendant Daniel Coronado, a sergeant of the Uvalde Police Department, who spread the word that the shooter was barricaded; (4) Defendant Christopher Kindell, a ranger of the Texas Department of Public Safety ("DPS"); (5) Defendant Juan Maldonado, a DPS sergeant who arrived four minutes after the shooting began and knew that shots were fired in the classrooms; (6) Defendant Johnny Field, a constable and an instructor at the regional police academy; (7) Defendant Emmanuel Zamora, a constable and an instructor at the regional police academy, who wrongly suggested the shooter had killed himself; and (8) 119 other unnamed John Doe officers with the Uvalde Police Department, Uvalde Sheriff's Office, and DPS.

Misinformation spread to other agencies, including DPS. Mistakenly hearing that the shooter was barricaded, Defendant DPS Captain Joel Betancourt, who was seventy miles away from Uvalde at the time the shooting began, instructed DPS officers to remain outside and establish a perimeter around the school. This perimeter effectively prevented desperate parents from charging the classrooms to rescue the children. The perimeter also prevented emergency services from nearing the school. Defendants J.J. Suarez, Justin Mendoza, and Max Dorflinger—all officers and/or police academy instructors of the Uvalde Police Department—guarded the perimeter and shoved, restrained, tackled, and tasered distraught family members and friends to keep them away from the school. Nolasco, whose department at the time did not have an active shooter policy, likewise prevented parents from entering the school.

After a short pause in gunfire, Ramos began shooting again at 11:44 a.m. Still, no one attempted to enter the classrooms. At 12:09 p.m., as more and more officers amassed at the school with weapons and body armor, Arredondo continued to instruct officers not to breach the classrooms, claiming "time is on our side right now." At 12:10 p.m., a student inside the

classrooms with Ramos bravely called 911 and reported that numerous students were dead, and at least eight were still alive. After the conversation between the student and the operator, the Law Enforcement Defendants learned that the classrooms were "full of victims." However, Arredondo instructed a group of officers who were preparing to breach the classrooms "to f*****g wait."

At 12:21 p.m., after a thirty-seven-minute break in shooting, Ramos began firing yet again. Still, no one attempted to enter the classrooms. Instead, the Law Enforcement Defendants, including Defendant Kindell who was later fired for his inaction, clogged the hallway. At 12:48 p.m., the U.S. Border Patrol Tactical Unit ("BORTAC"), a specialized unit of the United States Border Patrol, prepared to breach the door. Defendant Betancourt, however, instructed BORTAC to stand by. Disregarding the command, BORTAC breached the door at 12:50 p.m., shooting and killing Ramos within seconds.

E.T. died that day inside one of those two classrooms. She was only ten years old at the time and was a cherished daughter, granddaughter, sister, and friend.[1]

## II. LEGAL BACKGROUND

On November 28, 2022, the Plaintiffs filed the present suit. The Plaintiffs are: (1) Sandra Torres, the biological mother of E.T. who is bringing individual claims, as well as claims as (a) mother and representative of the state of E.T., and (b) next friend of E.S.T., a minor child and older sister of E.T.; (2) Justice Torres, the eldest sibling of E.T.; and (3) Eli Torres, Jr., E.T.'s older brother. The remaining defendants can be categorized into two groups: (1) Defendant UCISD; and (2) Defendants Pedro Arredondo, Joel Betancourt, Juan Maldonado, Christopher Kindell, and

[1] In ruling on the motions, the Court takes the Plaintiffs' alleged facts as true. However, the Court notes that the Plaintiffs' allegations are sometimes inconsistent with allegations in similar cases, as well as the facts and timeline developed during an extensive federal investigation into the shooting.

Does 1-119, who were law enforcement officers present at Robb Elementary School on May 24, 2022 (collectively the "Individual Law Enforcement Defendants").

In support of their claims against the Individual Law Enforcement Defendants in their individual capacities, and Arredondo in his official capacity, the Plaintiffs allege: (1) an unlawful Fourth Amendment seizure claim under 42 U.S.C. § 1983 (Count 5); and (2) a Fourteenth Amendment substantive due process claim under 42 U.S.C. § 1983 (Count 6). The Plaintiffs also bring a *Monell* liability claim under 42 U.S.C. § 1983 based on an unlawful seizure (Count 7) against UCISD and Arredondo in his official capacity. Lastly, the Plaintiffs bring a § 1983 claim against UCISD based on a substantive due process violation (Count 8). In response, the Defendants moved for dismissal under Rule 12(b)(1), Rule 12(b)(6), and/or Rule 12(b)(7) of the Federal Rules of Civil Procedure.

## III. ANALYSIS

### A. Rule 12(b)(1)

The Court will first begin with the Defendants' Rule 12(b)(1) arguments. Under Federal Rule of Civil Procedure 12(b)(1), "[a] case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quoting *Nowak v. Ironworkers Loc. 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir.1996)). The "threshold question in every federal case" is "determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Therefore, "[w]hen a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

In defending against a Rule 12(b)(1) motion, the party asserting jurisdiction bears the burden of proving that jurisdiction exists. *Id.* Courts assessing subject matter jurisdiction under Rule 12(b)(1) may consider: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.*

**1. Article III Standing**

The Defendants first argue that the Plaintiffs lack constitutional standing to bring their individual § 1983 claims because their claims are predicated on alleged violations of the constitutional rights of E.T. Before a federal court can consider the merits of a legal claim, "the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue." *Whitmore v. Arkansas*, 495 U.S.149, 154 (1990). Article III of the United States Constitution limits federal courts' jurisdiction to "Cases" and "Controversies." U.S. Const., art. III, § 2. No case or controversy exists when a party lacks standing to sue. *Williams v. Parker*, 843 F.3d 617, 620 (5th Cir. 2016). "Standing in federal court is determined entirely by Article III and depends in no degree on whether standing exists under state law." *Abraugh v. Altimus*, 26 F.4th 298, 303 (5th Cir. 2022) (citation modified).

Standing under Article III is evaluated on a claim-by-claim basis. *Hotze v. Hudspeth*, 16 F.4th 1121, 1125 (5th Cir. 2021). To establish Article III standing, the party invoking federal jurisdiction bears the burden of showing (1) an "injury in fact" that is (2) "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court," (3) which a favorable decision is likely to redress. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation modified). "An injury-in-fact constitutes 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not

conjectural or hypothetical.'" *Wendt v. 24 Hour Fitness USA, Inc.*, 821 F.3d 547, 550 (5th Cir. 2016) (quoting *Lujan*, 504 U.S. at 560). "[W]hen considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim." *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 191 (5th Cir. 2015) (quoting *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007)).

"In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499 U.S. 400, 410 (1991). A litigant, however, may bring an action on behalf of a third party, provided three important criteria are met: (1) "The litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute"; (2) "the litigant must have a close relation to the third party" and must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate; and (3) "there must exist some hindrance to the third party's ability to protect his or her own interests," such as inaccessibility, mental incompetence, or other disability. *Id.* at 410-11 (citations omitted); *Whitmore*, 495 U.S. at 163 (discussing standing in the context of next friend).

With this in mind, it is well established that a parent has Article III standing to file suit over the wrongful death of a child, and, conversely, a child has Article III standing to file suit over the wrongful death of a parent. *Abraugh,* 26 F.4th at 304. An administrator or representative of a deceased's estate likewise has standing, where the "estate has suffered an injury that the defendants are allegedly responsible for, and it seeks redress in the form of money damages." *Id.*

Plaintiff Sandra Torres, as E.T.'s mother and representative of the estate, therefore, has Article III standing to pursue her claims. As siblings of E.T., however, Plaintiffs Justice Torres, Eli Torres, Jr., and E.S.T. do not have that same fundamental interest in the death of E.T. *See*

*Ward v. City of San Jose*, 967 F.2d 280, 283-84 (9th Cir. 1991); *Bell v. Milwaukee*, 746 F.2d 1205, 1244-45 (7th Cir. 1984) (siblings may not recover under § 1983 for deprivation of a liberty interest); *see also Lawrence v. San Bernardino*, Civ. No. 4-00336, 2005 WL 5950105, at *10 (C.D. Cal. Jul. 27, 2005) ("The constitutional interest in familial companionship extends to protect from unwarranted state interest of parents and children. Siblings, on the other hand, do not have such a constitutionally-protected interest."). Therefore, they, as well as Sandra Torres as next friend of E.S.T., lack constitutional standing to bring their claims.

Certain Defendants also challenge Plaintiff Sandra Torres's "standing" under the Texas Wrongful Death Statute and the Texas Survival Statute. (*See* ECF No. 81 at 6-7; ECF No. 88 at 20.)[2] Whether a party has "standing under the state wrongful death or survival statutes to bring a claim under 42 U.S.C. §§ 1981, 1983, and 1988" is a question of prudential standing, not Article III standing. *See Abraugh*, 26 F.4th at 302 (quoting *Pluet v. Frasier*, 355 F.3d 381, 383 (5th Cir. 2004)). Prudential standing presents a merits question under Rule 12(b)(6) and does not implicate subject matter jurisdiction. *See id.* at 304. The Court, however, finds that the easier path forward

[2] UCISD also argues that the Court lacks subject matter jurisdiction over any wrongful death or survival claim because a school district is exempt from liability under Texas law. *See, e.g.,* Tex. Civ. Prac. Rem. Code §§ 17.001-002; *City of Amarillo v. Martin*, 971 S.W.2d 426, 427 (Tex. 1998) ("Under the common-law doctrine of sovereign immunity, a municipality is immune from tort liability for its own acts or the acts of its agents unless the Texas Tort Claims Act waives immunity."). It is true that the Court likely would not have subject matter jurisdiction over a Wrongful Death Act claim against a school district. *See, e.g., Est. of Coates v. Hawthorne*, No. 24-40561, 2025 WL 2794278, at *2 (5th Cir. Oct. 1, 2025). The Plaintiff, however, does not explicitly allege a claim under Texas law and explains that she in fact is not doing so. Rather, she is simply using the Texas Wrongful Death Act to fill in gaps under § 1983, since § 1983 is silent on who may sue on behalf of a deceased person. *See Robertson v. Wegmann*, 436 U.S. 584, 587-89 (1978) (courts may borrow from state law where § 1983 is silent and state law is not inconsistent with the policies of § 1983); *Pluet v. Frasier*, 355 F.3d 381, 383-84 (5th Cir. 2004); *see also* 42 U.S.C. § 1988. But "[c]ourts do not look to state laws in § 1983 actions to determine *who may be sued* because that is governed by § 1983 itself." *County of Dallas v. Sempe*, 151 S.W.3d 291, 295 (Tex. App.—Dall. 2004) (emphasis added). Municipalities and school districts are not exempt from liability under § 1983. *Id.* The Court, therefore, does indeed have subject matter jurisdiction over a § 1983 claim seeking wrongful death damages from a school district. *Borum v. Swisher County*, No. 2:14-CV-127-J, 2014 WL 4814541, at *11 (N.D. Tex. Sept. 29, 2014).

is to discuss the actual merits of the Plaintiff's underlying claims, because no matter the issue of prudential standing, the Plaintiff's claims do not survive Rule 12(b)(6) scrutiny.

**B. Rule 12(b)(6)**

Next, the Court will address the Defendants' Rule 12(b)(6) arguments. Rule 12(b)(6) allows a party to file a motion to dismiss based on a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (citation modified).

When determining whether a claim is properly stated, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quotations omitted). However, the court cannot "accept as true conclusory allegations or unwarranted deductions of fact." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (quotations omitted). In ruling on a Rule 12(b)(6) motion to dismiss, courts generally should not go beyond the pleadings and "must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint." *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996); Fed R. Civ. P. 12(d).

The Law Enforcement Defendants rely on qualified immunity as a basis for dismissal. The doctrine of qualified immunity shields government officials from liability "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lincoln v. Turner*, 874 F.3d 833, 847 (5th Cir. 2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense." *Id.* (quoting *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009)). A plaintiff seeking to defeat qualified immunity must plead sufficient facts to show: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Courts may look into either prong of the qualified immunity inquiry first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Lincoln v. Barnes*, 855 F.3d 297, 301 (5th Cir. 2017) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "This inquiry 'does not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 741). The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in

the particular circumstances that he or she faced." *District of Columbia v. Wesby*, 583 U.S. 48, 63-64 (2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).[3]

**1. Individual Law Enforcement Defendants**

The Individual Law Enforcement Defendants seek dismissal of Plaintiff Sandra Torres's § 1983 claims under Rule 12(b)(6) for failure to state a claim.[4] "To state a claim under § 1983, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). The parties do not dispute that the Individual Law Enforcement Defendants were acting under color of state law—only whether the Plaintiffs adequately allege a violation of constitutional rights and whether that right was clearly established.

**a. Fourth Amendment Claim**

The Plaintiff's first basis for her § 1983 claims is a violation of the Fourth Amendment. Specifically, the Plaintiff argues that E.T. was unlawfully seized by the Individual Law Enforcement Defendants. "The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Torres v. Madrid*, 592 U.S. 306, 311 (2021) (quoting U.S. Const. amend. IV). The protections of the Fourth Amendment extend to the states through the Fourteenth Amendment. *Dunaway v. New York*, 442 U.S. 200, 207 (1979).

---

[3] The Plaintiff argues that the doctrine of qualified immunity should be abolished, an argument far beyond the reach of the Court's power.

[4] Because the siblings do not have standing, the Court will focus exclusively on the claims brought by Plaintiff Sandra Torres, individually, and as mother and representative of E.T.'s estate.

The seizure of a person for Fourth Amendment purposes "can take the form of physical force or a show of authority that in some way restrains the liberty of the person." *Madrid*, 592 U.S. at 311 (citation modified) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). A seizure occurs if, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (quotations omitted). "Physical force is not required to effect a seizure; however, absent physical force, '*submission* to the assertion of authority' is necessary." *McLin v. Ard*, 866 F.3d 682, 691 (5th Cir. 2017) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).

The Plaintiff does not allege that the Individual Law Enforcement Defendants physically seized E.T. or ever fired a gun, prior to BORTAC's entry into the classroom. Rather, she contends that the circumstances amounted to a seizure when the officers used a show of authority in surrounding the classroom with guns and blocked off the school from potential rescuers, resulting in involuntary confinement of the students and teachers who were "barricaded" and "trapped" inside with a killer. No reasonable person under the circumstances, says the Plaintiff, would have felt free to leave the classroom for fear of being shot by law enforcement.

Importantly, "[v]iolation of the Fourth Amendment requires an *intentional* acquisition of physical control." *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989) (emphasis added). As the Supreme Court explained:

> [A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied.*

*Id.* at 596-97. The general rule derived from *Brower* is that there can only be a Fourth Amendment seizure if that person was the "deliberate object" of the exertion of force intended to terminate freedom of movement. *Ciminillo v. Streicher*, 434 F.3d 461, 465 (6th Cir. 2006); *see also Madrid*, 592 U.S. at 317 ("A seizure requires the use of force *with intent to restrain*. Accidental force will not qualify. Nor will force intentionally applied for some other purpose satisfy this rule.").

*Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002), is instructive in showing why the Plaintiff's allegations are deficient. In *Ewolski*, police engaged in a two-day standoff with a hostage taker, who was holding his wife and son captive inside the home with a gun. Officers surrounded the home, broke down the door, and accidentally set part of the home on fire with an incendiary device. After they extinguished the fire, they reconvened, and the next day sent in an armored vehicle, only to find the bodies of the hostage taker and his son. Tragically, the hostage taker shot his son and then killed himself.

The court held that the hostage taker was seized because he was not free to leave, *and* because the specific intent of the officers was to restrain him. *Id.* at 506. According to the court, (1) the officers' actions qualified "as an intentional application of physical force and show of authority made with the intent of acquiring physical control," and (2) "this assertion of force and authority succeeded in restraining [the hostage taker's] liberty to leave his home." *Id.* The court, however, concluded that the hostage taker's wife and son *were not seized* because there was no reason to believe that the officers were preventing them from leaving the house. *Id.* at 507. The court emphasized that "the clear objective of the police [was] to remove them from the house and remove them from the control of" the hostage taker. *Id.*

The Plaintiff similarly fails to allege any facts that plausibly suggest the Individual Law Enforcement Defendants intentionally applied physical force or a show of authority with the

purpose of acquiring physical control over the children inside the classrooms. *Cf. Pierce v. Doe*, 849 F. App'x 472, 475 (5th Cir. 2021) (finding no Fourth Amendment seizure even where law enforcement deliberately shot through a window to subdue a hostage taker but accidentally shot the hostage); *Singleton v. Casanova*, No. 22-50327, 2024 WL 2891900, at *4-5 (5th Cir. June 10, 2024) (intentional conduct required); *Childress v. City of Arapaho*, 210 F.3d 1154, 1156-57 (10th Cir. 2000) (same). Rather, the only plausible reading of the Plaintiff's allegations is that the shooter was the target, and the intent of surrounding the classrooms was to assert control over the shooter, not the children. The Plaintiff also fails to allege that the officers were preventing the children from leaving the classroom, aside from making a conclusory assertion that the active shooter policy and the officers' armed presence restrained the children's ability to leave the classroom. Because the challenged conduct does not objectively manifest an intent to restrain the children or anyone else inside the classroom except for the shooter, the Fourth Amendment simply does not apply to the facts alleged.

Assuming the Plaintiff could establish a Fourth Amendment violation, the Plaintiff falls far short of defeating the Law Enforcement Defendants' assertion of qualified immunity. The Supreme Court has held that the "specificity" of the "clearly established" rule is "especially important in the Fourth Amendment context," *Mullenix*, 577 U.S. at 12, requiring a party to "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment," *White v. Pauly*, 580 U.S. 73, 79 (2017). The Plaintiff has not identified a case in which the Supreme Court, the Fifth Circuit, or in fact any other circuit, found a Fourth Amendment violation under similar facts. The only comparable case that addresses a Fourth Amendment claim under similar circumstances, to the Court's knowledge, is *Ewolski*, 287 F.3d 492, which found no Fourth Amendment violation. Therefore, the Individual Law Enforcement

Defendants are all entitled to qualified immunity and dismissal of the §1983 Fourth Amendment claims.

**b. Due Process Clause**

Plaintiff Sandra Torres's next basis for her § 1983 claims is a substantive due process violation of the Fourteenth Amendment. According to the Plaintiff, the Individual Law Enforcement Defendants had a duty to protect the children yet acted with deliberate indifference to known threats to their safety and well-being (1) by barricading them inside a classroom with a known murderer, and (2) by failing to adequately provide for their medical needs.

The United States Constitution provides, "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The Due Process Clause was intended to prevent government officials from abusing their power or employing it as an instrument of oppression." *Brown v. Nationsbank Corp.*, 188 F.3d 579, 591 (5th Cir. 1999). "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). Due process guarantees "more than fair process" and covers "a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them." *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quotations omitted).

The Due Process Clause protects "the people from the State" but is not a guarantor of protection from each other. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (2002). Accordingly, "a State's failure to protect an individual against private violence [generally] does not constitute a violation of the Due Process Clause." *Id.* at 197. Furthermore, the Due Process Clause "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may

not deprive the individual." *Id.* at 196. The Plaintiff relies on two exceptions to these general rules: (1) the special relationship exception; and (2) the state-created danger exception.

***i. Special Relationship***

The special relationship exception to no duty to protect applies when the state, by a governmental order or the affirmative exercise of state power, "has effectively taken the plaintiff's liberty under terms that provide no realistic means of voluntarily terminating the state's custody *and* which thus deprives the plaintiff of the ability or opportunity to provide for his own care and safety." *Doe ex Rel. Magee v. Covington Cnty. Sch. Dist.*, 675 F.3d 849, 857 (5th Cir. 2012) (quoting *Walton v. Alexander*, 44 F.3d 1297, 1305 (5th Cir. 1995) (en banc)). When a special relationship is created, a State assumes some responsibility for an individual's safekeeping and general well-being. *DeShaney*, 489 U.S. at 199-200. When the State acts with deliberate indifference to the safety and wellbeing of those within its care, it violates the individual's due process rights. *McClendon v. City of Columbia*, 305 F.3d 314, 326 (5th Cir. 2002).

The Plaintiff fails to allege sufficient facts to show the existence of a custodial relationship between E.T. and the Individual Law Enforcement Defendants. As the Supreme Court explains, the rationale for the exception to no duty to protect is simply enough:

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the . . . Due Process Clause.

*Deshaney*, 489 U.S. at 200. "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of

liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *Id.*

The custodial requirement of a special relationship is a "difficult and more exacting standard than for a Fourth Amendment seizure." *Pierce v. Springfield Twp.*, 562 F. App'x 431, 437 (6th Cir. 2014) (quotations omitted). Because of the stringent standard, the Fifth Circuit has recognized the exception in only three very limited circumstances, namely when the State (1) incarcerates a prisoner, (2) involuntarily commits someone to an institution, or (3) places a child in foster care. *Magee*, 675 F.3d at 856. The Fifth Circuit has repeatedly held that "the state does *not* create a special relationship with children attending public schools" because "[p]ublic schools do not take students into custody and hold them there against their will in the same way that a state takes prisoners, involuntarily committed mental health patients, and foster children into its custody." *Id.* at 857-58; *Doe v. Hillsborough Indep. Sch. Dist.*, 113 F.3d 1412, 1414-15 (5th Cir. 1997) (en banc); *see also Walton,* 44 F.3d at 1305 (holding no special relationship existed between the state and a deaf student at a full-time, residential public school for the deaf because these students "attended this school voluntarily with the option of leaving at will"); *L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323, 1329 (11th Cir. 2020) ("School attendance, even when compelled by truancy and compulsory attendance laws, is not similar in kind to incarceration or institutional confinement."). "Without a special relationship, a public school has no *constitutional* duty to ensure that its students are safe from private violence." *Magee*, 675 F.3d at 858; *see also Johnson v. Dall. Indep. Sch. Dist.*, 38 F.3d 198, 202-03 (5th Cir. 1994) (finding no special

relationship between a high school and a student shot and killed in the school hallway, during the school day, by a non-student who gained access to the school).[5]

The Plaintiff attempts to circumvent these cases by alleging that the Individual Law Enforcement Defendants created a custodial relationship with E.T. by trapping her in the classroom in a manner similar to incarceration or institutional confinement with no ability to care for herself. They then acted with deliberate indifference to her safety by allowing the shooter to continue his rampage for a full 77 minutes.

This argument fails for two reasons. First, the Individual Law Enforcement Defendants' alleged actions are insufficient to show a custodial relationship. "[T]he mere exercise of 'control over an environment is alone insufficient' to bring an individual within *DeShaney's* custody exception." *Pierce*, 562 F. App'x at 437 (quoting *Carver v. City of Cincinnati*, 474 F.3d 283, 286 (6th Cir. 2007) (holding that officers' actions in securing a potential crime scene did not constitute custody)). Likewise, preventing a rescue effort does not create a custodial relationship. *Hale v. Bexar County*, 342 F. App'x 921 (5th Cir. 2009). Rather, the exception requires, at a minimum, "actual, physical restraint" by police. *Cutlip v. City of Toledo*, 488 F. App'x 107, 114 (6th Cir. 2012).

As previously discussed, the Plaintiff has not plausibly alleged that the human barrier had the effect of seizing E.T. for purposes of the Fourth Amendment. Rather, any fair reading of the Plaintiff's complaint shows that the intent of the barrier was to restrain the shooter and ultimately free, not restrain, those inside the classrooms. The Plaintiff also fails to allege that the officers

[5] In the context of a school shooting by a non-student, the Fifth Circuit explained that an injury arising from private violence "is attributable to the fortuity that an armed, violent *non-student* trespassed on campus. There can be no liability of state actors for this random criminal act unless the fourteenth amendment were to make the schools virtual guarantors of student safety—a rule never yet adopted even for those in society, such as prisoners or the mentally ill or handicapped, who are the beneficiaries of a 'special relationship' with the state." *Johnson,* 38 F.3d at 203 (citing *Farmer v. Brennan*, 511 U.S. 825 (1994)).

were preventing the children from leaving any classroom, aside from making a conclusory assertion that the officers' armed presence trapped the children inside the classrooms.

Second, a special relationship must exist *before* a state has "a constitutional duty to protect that individual from dangers, including, in certain circumstances, private violence." *Magee*, 675 F.3d at 863 (quoting *McClendon,* 305 F.3d at 324). "[T]he same act that creates the special relationship [cannot] also violate the duty of care owed to the student." *See id.* at 862. Here, the act of surrounding the classrooms cannot simultaneously create the special relationship *and* violate the duty of care established by that relationship. Because there was no special relationship between the State and E.T., the Individual Law Enforcement Defendants had no constitutional duty to ensure E.T. was safe from private violence. *See Salas v. Carpenter*, 980 F.2d 299, 309 (5th Cir. 1992) ("Generally, the absence of a special relationship defeats any due process claim based upon a failure to provide protective services.").

Even if the Individual Law Enforcement Defendants' actions created a special relationship, existing case law falls far short of clearly establishing the violation of E.T.'s substantive due process rights under such a theory. The Fifth Circuit has *never* recognized a special relationship in this context, and in fact, a similar argument has been rejected by this circuit, as well as others. *See, e.g., Hale,* 342 F. App'x at 926-27 (preventing the rescue of people exposed to a chlorine gas leak did not create a special relationship between the state and the victims); *Salas*, 980 F.2d at 308 (finding no constitutional violation when a sheriff prevented city officials from aiding a hostage, used incompetent hostage negotiators, and failed to provide adequate equipment to handle the hostage situation); *Peterson*, 982 F.3d at 1330 (rejecting the argument that the presence of armed school-safety officers amounted to custody); *Tanner v. County of Lenawee*, 452 F.3d 472 (6th Cir. 2006) (dismissing the notion that setting up a perimeter around a house and cutting off potentially

lifesaving rescue restrained liberty or prevented the plaintiff from acting on his own behalf). Therefore, the Individual Law Enforcement Defendants are entitled to qualified immunity and dismissal of this claim.

***ii. State-Created Danger***

The Plaintiff's reliance on a state-created danger theory of liability fares no better. The state-created danger exception to no duty to protect is a legal concept developed from dicta in *DeShaney* that holds state actors liable for harm committed by a private actor. For the exception to apply, a plaintiff, at a minimum, must show that "[1] the defendants used their authority to create a dangerous environment for the plaintiff and that [2] the defendants acted with deliberate indifference to the plight of the plaintiff." *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 537-38 (5th Cir. 2003). "To establish deliberate indifference for purposes of state-created danger, the plaintiff must show that '[t]he environment created by the state actors must be dangerous; they must know it is dangerous; and . . . they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur.'" *Magee,* 675 F.3d at 865 (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 585 (5th Cir. 2001)). A claim may also exist when state actors "increase a person's vulnerability to private violence by interfering with protective services which otherwise would be available." *Salas*, 980 F.2d at 309 (citing *Freeman v. Ferguson*, 911 F.2d 52, 54 (8th Cir. 1990)).

According to the Plaintiff, the act of surrounding the classrooms and essentially trapping the shooter in the classrooms increased the risk of harm to the children. But to the detriment of the Plaintiff, neither the Supreme Court nor the Fifth Circuit has explicitly adopted the state-created danger exception. In *Sterling v. City of Jackson*, 159 F.4th 361 (5th Cir. 2025), a Fifth Circuit panel briefly recognized the state-created danger doctrine as a viable theory for a

substantive due process claim, where a city knowingly contaminated drinking water with lead and then encouraged residents to drink the water. However, the Fifth Circuit as a whole quickly retreated from this position by granting a petition for rehearing en banc and vacating the opinion. 159 F.4th 361 (5th Cir. 2025). In the recently released en banc opinion, the majority avoided any mention of the phrase "state-created danger" and simply held that under the specific facts of *Sterling*, there was no due process right to bodily integrity. No. 24-60370, 2026 WL 2617771 (5th Cir. Sept. 4, 2026). In other words, the Fifth Circuit still has not explicitly adopted or rejected a state-created danger theory of liability, despite an opportunity to do so.

Regardless of the fate of state-created danger within the Fifth Circuit, the law was not clearly established at the time of the shooting. Although the Fifth Circuit has loosely articulated the elements of a cause of action, it "has repeatedly noted its unavailability." *Est. of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 1002 (5th Cir. 2014) (collecting cases); *see also Fisher v. Moore*, 73 F.4th 367, 369 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 569 (2024) ("This circuit has never adopted a state-created danger exception to the sweeping 'no duty to protect' rule."); *Doe v. Columbia-Brazoria Indep. Sch. Dist.*, 855 F.3d 681, 688 (5th Cir. 2017) (emphasizing that Fifth Circuit panels have repeatedly noted the unavailability of a state-created-danger exception); *Williams v. Williams*, No. 23-20376, 2024 WL 811526, at *1 (5th Cir. Feb. 27, 2024) ("The appellant recognizes that she cannot prevail under this court's longstanding jurisprudence whereunder we do not recognize 'state-created danger' as a theory of liability for a claimed constitutional violation. Appellant asks the court to use this case as a vehicle to adopt, for the first time, that theory. We decline the invitation."); *Robinson v. Webster County*, 825 F. App'x 192, 196 (5th Cir. 2020) (same). The Law Enforcement Defendants would thus be entitled to qualified immunity and dismissal of these Fourteenth Amendment claims because "[a] *never*-established

right cannot be a *clearly* established one."[6] *Fisher*, 73 F.4th at 369 (discussing the state-created danger exception).[7]

**2. Official Capacity Claims**

Next, Defendant Arredondo seeks dismissal of the claims against him in his official capacity. "Personal-capacity suits seek to impose liability upon a government official as an individual while official-capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). Accordingly, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citations omitted). "Thus, when a plaintiff asserts claims against both the municipal entity and a municipal official in his or her official capacity, the Court can dismiss the official capacity claim as 'redundant' to the municipal-entity claim. *Bustillos v. El Paso Cnty. Hosp. Dist.*, 226 F. Supp. 3d 778, 789 (W.D. Tex. 2016) (quoting *Sanders–Burns v. City of Plano*, 594 F.3d 366, 373 (5th Cir. 2010)).

Because the Plaintiff has sued UCISD, the real party in interest, any official capacity claims are redundant. The Court will therefore dismiss the official capacity claims against Arredondo.

**3. Municipal Liability**

The Court now turns to the claims against UCISD. Essentially, Plaintiff Sandra Torres alleges that UCISD was deliberately indifferent to the need to implement an active shooter policy

---

[6] The Plaintiff argues that she should be allowed to conduct extensive discovery to effectively build a case for recognizing state-created danger. But the purpose of qualified immunity is to protect a state actor from having to undergo the burden of discovery when the constitutional right is not clearly established. *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012).

[7] As all claims raised by the Individual Law Enforcement Defendants have been resolved, it is unnecessary to discuss any Rule 12(b)(7) arguments.

and/or to adequately train their employees on how to respond to an active shooter, resulting in a violation of E.T.'s Fourth and Fourteenth Amendment rights. She alternatively alleges that Defendant Arredondo was an official policymakers for UCISD and created a new policy of barricading E.T. in the classrooms with the shooter and cutting off private aid, in violation of her constitutional rights.

The Plaintiff's claims cannot survive Rule 12(b)(6) scrutiny. A municipality or other local government entity may be liable under § 1983 "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell*, 436 U.S. at 692); *Moore*, 233 F.3d at 874 (noting that a school district may be held liable under § 1983 "for constitutional violations committed pursuant to a governmental policy or custom"). To successfully state a § 1983 claim against a municipality, a plaintiff must plead facts that plausibly establish "a policy maker, an official policy, and a violation of constitutional rights whose 'moving force' is the policy or custom." *Ratliff v. Aransas County*, 948 F.3d 281, 285 (5th Cir. 2020) (*quoting Piotrowski*, 237 F.3d at 578).

In addressing municipal liability under § 1983, a court must separate two different issues: "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the [governmental entity] is responsible for that violation." *Collins*, 503 U.S. at 120. If there is no underlying constitutional violation, dismissal is proper under Rule 12(b)(6). *Rios v. City of Del Rio*, 444 F.3d 417, 427 (5th Cir. 2006).

Local governments are only responsible for their own unlawful acts and "are not vicariously liable for their employees' actions." *Connick*, 563 U.S. at 60. However, a municipality may be liable for failing to train its employees when a constitutional violation committed by the

employee results directly from a municipal custom or policy. *Conner v. Travis County*, 209 F.3d 794, 796 (5th Cir. 2000). To state a claim for failure to train, a plaintiff must plead three things: (1) inadequate training of the individuals involved; (2) the inadequate training caused a violation of the plaintiff's constitutional rights; and (3) the inadequate training "constituted deliberate indifference of municipal policymakers to the plaintiff's constitutional rights." *Bledsoe v. Willis*, 665 F. Supp. 3d 810, 824 (W.D. La. 2023) (citing *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003)); *see also Baker v. Putnal,* 75 F.3d 190, 200 (5th Cir. 1996). Importantly, governmental entities "cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established." *Bustillos v. El Paso Cnty. Hosp. Distr.*, 891 F.3d 214, 222 (5th Cir. 2018) (quoting *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 511 (6th Cir. 2012)); *see also Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007) (en banc).

As previously discussed, the Plaintiff has not established a violation of any constitutional right. Furthermore, to the extent that the Plaintiff's claims are based on UCISD's failure to train, a municipality cannot be deliberately indifferent to a policy that violates a constitutional right that is not clearly established. *Bustillos*, 891 F.3d at 222. In other words, even if E.T.'s constitutional rights had been violated, UCISD cannot be held liable because E.T.'s constitutional rights were not yet clearly established at the time of the shooting. Therefore, UCISD is entitled to dismissal of the claims against it. *Id.*; *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (holding that no case "authorizes the award of damages against a municipal corporation based on the actions of one of its officers when . . . the officer inflicted no constitutional harm"); *Rios*, 44 F.3d at 425-26.

**C. Leave to Amend**

The Plaintiff filed a motion to amend the complaint, attaching the proposed amended complaint to the motion. (ECF No. 146.) In the proposed amended complaint, the Plaintiff adds a new plaintiff who brings claims as administrator of the estate of E.T, drops official capacity claims, and adds additional facts about Ramos's use of social media and video games and Daniel Defense's role leading up to the shooting. The Plaintiff also alleges additional information to show the Individual Law Enforcement Defendants clearly knew or should have known that they faced an active shooter in a classroom full of students, some of whom were still alive, yet they acted to protect themselves instead of the students. The Plaintiff also repeatedly stresses that the Individual Law Enforcement Defendants barricaded the students in the classrooms and prevented would-be rescuers from entering the classrooms.

Federal Rule of Civil Procedure 15(a)(2) counsels that the Court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "Generally, courts should give plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case under Rule 12(b)(6)." *Pierce v. Hearne Indep. Sch. Dist.*, 600 F. App'x 194, 200 (5th Cir. 2015). However, a court need not allow amendment when there is substantial reason to deny leave, such as when amendment would be futile or the plaintiffs have already alleged their best case. *Id.*; *see also Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). Amending a complaint is futile when "the theory presented in the amendment lacks legal foundation or because the theory has been adequately presented in a prior version of the complaint." *Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 591 (5th Cir. 2016).

As the law stands in the Fifth Circuit, any amendment to add facts in support of their claims against the Municipal Defendants and the Individual Law Enforcement Defendants would be

futile: (1) the Fourth Amendment does not apply to the alleged facts; (2) the Fifth Circuit has never officially adopted a due process claim based on a state-created danger theory; and (3) the Fifth Circuit has never before extended the "special relationship" exception to a school setting. *See Fisher*, 73 F.4th 367; *Doe v. Bridge City Indep. Sch. Dist.*, No. 20-40596, 2021 WL 4900296, at *2 (5th Cir. Oct. 20, 2021) (holding that amending to plead a custodial relationship between students and a school is futile under *DeShaney*). Even if the Fifth Circuit were to recognize these theories under the facts alleged, the Defendants would nonetheless be entitled to dismissal, where the law falls far short of being clearly established. *Bustillos*, 891 F.3d at 222. Without a viable underlying clearly established constitutional claim, amending to allege additional facts is not warranted.

The Court, however, has yet to address the claims against Defendants Daniel Defense and Oasis Outback and will do so in a separate order. Therefore, the Court will defer ruling on the motion to amend to the extent it pertains to the Gun Defendants.

**D. TXDPS Does 1 through 119**

The claims against TXDPS Does 1 through 119 must also be dismissed. "A plaintiff should be given an opportunity through discovery to determine the identity of a defendant . . . ." *Hittle v. City of Garland*, 1 F.3d 1236, at *1 (5th Cir. 1993). But "if the plaintiff fails to name the defendant after a reasonable period of time, the claim is subject to dismissal for failure to prosecute." *Id.*; Fed. R. Civ. P. 41(b). Although the Court has discretion to dismiss a claim with or without prejudice, a dismissal with prejudice is permitted only "in the face of a clear record of delay or contumacious conduct by the plaintiff." *Colle v. Brazos County*, 981 F.2d 237, 243 (5th Cir. 1993) (quoting *Durham v. Fla. E. Coast Ry. Co.*, 385 F.2d 366, 368 (5th Cir. 1967)).

Dismissal with prejudice is warranted. The Plaintiff has had a sufficient opportunity to determine the identity of the Does. The shooting occurred on May 24, 2022, over four years ago. Shortly after, the federal government conducted a well-publicized investigation into the shooting, providing details about not only the shooter and his victims, but also the responding law enforcement agents and agencies. Over three years after filing suit, the Plaintiff still has not identified the Does.

Even if the Plaintiff was allowed additional time to amend to name the Does, any such amendment would be futile. An amendment to substitute a named party for a "John Doe" does not relate back under Rule 15 of the Federal Rules of Civil Procedure. *See Jacobsen v. Osborne*, 133 F.3d 315 (5th Cir 1998). Therefore, any claims against the Does would likely be barred by § 1983's two-year statute of limitations period. *See Piotrowski*, 51 F.3d at 514 n.5. Even if there was a basis for tolling the limitations period, there is no merit to the claims against the Does, which are identical to the claims of the Individual Law Enforcement Defendants.

## IV. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that:

(1) The motions to dismiss filed by the Individual Law Enforcement Defendants [ECF Nos. 57, 81] and Municipal Defendants [ECF No. 105] are **GRANTED**;

(2) The individual claims of E.S.T., Justice Torres, and Eli Torres, Jr. against the Law Enforcement Defendants and UCISD are **DISMISSED WITHOUT PREJUDICE** for want of jurisdiction;

(3) Plaintiff Sandra Torres's individual and representative claims against the Individual Law Enforcement Defendants and UCISD are **DISMISSED WITH PREJUDICE**;

(4) The claims against John Does 1-119 are **DISMISSED WITH PREJUDICE**, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, for failure to prosecute;

(5) Pursuant to the Notice of Dismissal [ECF No. 169], the claims against Defendants City of Uvalde, Mariano Pargas, Jesus "J.J." Suarez, Daniel Coronado, Justin Mendoza, and Max Dorflinger are **DISMISSED WITH PREJUDICE** and their motions to dismiss [ECF Nos. 66, 88, 90] **DENIED AS MOOT**.

(6) Pursuant to the Notice of Dismissal [ECF No. 168], the claims against Defendants Uvalde County, Ruben Nolasco, Emmanuel Zamora, and Johnny Field are **DISMISSED WITH PREJUDICE,** and their motions to dismiss [ECF Nos. 58, 59] **DENIED AS MOOT**;

(7) The motions to withdraw as attorney [ECF Nos. 129, 144] are **GRANTED**;

(8) The motions for status conference [ECF No. 130, 171] are **DENIED;** and

(9) UCISD's motion to substitute attorney [ECF No. 175] is **GRANTED**.

SIGNED and ENTERED on this 29th day of September 2026.

ALIA MOSES
Chief United States District Judge